# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**DAVID L. STEINER**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**STEVEN A. JOHNSON**
Johnson, Rappa & Ivancevich LLC
Merrillville, Indiana

FILED

Jul 17 2012, 9:11 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

STATE OF INDIANA MILITARY )
DEPARTMENT, STATE ARMORY )
BOARD OF THE STATE OF INDIANA, )
and GOVERNOR MITCH E. DANIELS, JR., )
)
    Appellants-Defendants, )
)
        vs. )    No.  45A05-1109-PL-465
)
CONTINENTAL ELECTRIC COMPANY, INC., )
)
    Appellee-Plaintiff. )

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Jeffery J. Dywan, Judge
Cause No. 45D11-0803-PL-21

**July 17, 2012**

**OPINION-FOR PUBLICATION**

**BAKER, Judge**

The State had an agreement with a general contractor for an airport construction project in Gary. There was no contract between the State and one of the subcontractors. But the trial court erroneously determined that the State had breached a contract between the State and the subcontractor. In this case, the subcontractor's remedy for any alleged breach in these circumstances was against the general contractor.

Additionally, the trial court erred in concluding that the subcontractor was entitled to recover from the State on the basis of quantum meruit. Contrary to the subcontractor's contention, there was no confusion in the main contract about what was—or was not—to be included in the agreement. Moreover, there has been no showing that the State unjustly retained a benefit without having paid for it.

Appellants-defendants State of Indiana Military Department,[1] State Armory Board of the State of Indiana,[2] and Governor Mitch E. Daniels, Jr. (collectively, Indiana Military), appeal the trial court's judgment in favor of appellee-plaintiff Continental Electric Company, Inc. (Continental Electric), on its claim against Indiana Military for breach of contract and quantum meruit. Specifically, Indiana Military argues that the judgment must be set aside because it had paid the general contractor on a particular project in full, and that Continental Electric failed to meet the elements of a four-part test that relates to the entitlement of subcontractors to recover under the contract as a general

---

[1] Indiana Code section 10-16-3-1 provides that the State of Indiana Military Department administers all matters concerning the National Guard.

[2] Indiana Code section 10-16-3-1 establishes that State Armory Board provides, manages, and cares for armories for the use of Indiana's military forces.

contractor would. Moreover, Indiana Military maintains that Continental Electric failed to establish that a measurable benefit was conferred on Indiana Military and that the retention of alleged benefits without payment would be unjust.

For the reasons stated above, we conclude that the trial court erred in awarding judgment in Continental Electric's favor. Thus, we reverse.

## FACTS[3]

A Project Manual for the Indiana National Guard Limited Army Aviation Support Facility, including bid documents, dated June 12, 2006, was prepared by Joint Forces Headquarters Indiana and CSO, the architect on the project. The primary purpose of the document preparation to solicit bids was for the construction of an aviation facility at the Gary/Chicago International Airport in Gary. CSO was both the project architect and construction administrator for Indiana Military.

Continental Electric is a family-owned company that specializes in electrical work, has had a long history of completing projects for the State of Indiana, and was experienced in handling the unique facets of such work. Bud Curry, a representative from Continental Electric, attended a pre-bid meeting on June 22, 2006. Alternate Number two that related to the installation of a generator at the facility was a topic of discussion at the meeting.

---

[3] We heard oral argument on June 12, 2012, in Indianapolis. We commend counsel for their able presentations.

3

The Larson-Danielson Construction Company (Larson) submitted its bid of $15,553,120 for the primary contract and included prices for various alternatives to the projects on or about July 12, 2006. Larson's bid was premised on estimates and bids that it had received from potential subcontractors, including Continental Electric. Continental Electric's bid stated that it is "pleased to offer our proposal to furnish and install the labor, material and equipment necessary for the electrical portion for the above project, $1,794,660." Tr. p.143. Under one of the alternatives known as "Alternate 2," Continental Electric stated "Diesel Generator, ADD $335,000." Tr. Ex. 4, p. 143. Larson subsequently provided a list of sub-contractors to CSO and Indiana Military that included Continental Electric, which set forth an amount of $1,794,000, for that company.

When Larson submitted its bid on the project, it indicated that it understood Alternate No. 2 was the provision of a diesel generator as specified in the Project Manual that included the packaged engine generators that were shown in various drawings. Larson's understanding was that the Alternate No. 2 plan specifically did not include a concrete generator pad. Various sections of the project manual referred to incidental wiring and components that were needed to connect the generator at the Alternate 2 site.

On the other hand, Indiana Military maintained that while the generator itself was to be bid as Alternate No. 2, the wiring and other components of the generator should have been part of the base bid. Prior to execution of the agreement between the Indiana Military and Larson and the subcontract between Larson and Continental Electric, CSO

prepared a "Clarification" of the Agreement. Paragraph 4 of Clarification No. 1 stated that

> It was discussed in the prebid meeting that installation of the generator and all connections are to be included in the base bid. The description of Alternate 2 in the project manual states the concrete pad is to be provided in the base bid. Please clarify the intent of Alternate 2, Diesel Generator.
>
> As discussed in the prebid meeting, the base bid shall include installation, final connections, startup and testing of the owner purchased generator. Alternate 2 shall include the generator only. Modify specifications to read as follows:
>
> Section 01230 - Alternates
>
> A. Revise Section 01230 - 3.01, B., 1. to read:
>
> > 1. In Base Bid, the Owner will provide the specified generator set only.
> >
> > 2. In Base Bid, the Contractor shall provide complete installation of the owner provided generator set including the concrete generator pad, all conduit and cabling as shown, final connections, startup and testing and as described in the drawings and specifications.

Tr. Ex. 7, p. 155.

> The Project Manual described Alternate No. 2, as follows:
>
> Alternate No. 2 - Diesel Generator: State amount to be added to or deducted from Base Bid to provide diesel generator as specified in Section 16231, Packaged Engine Generators, as shown on Drawings.
>
> 1. Concrete Generator pad shall be included in base bid.

Tr. Ex. 2, p. 95-96.

Indiana Military accepted Larson's bid on July 31, 2006. Thereafter, in September 2006, Larson contracted with Indiana Military for the base contract in the amount of $16,525,620 and a proposal under "Alternate #1" in the amount of $972,500.

Continental Electric maintained that it was not bound by any verbal discussion of Alternate No. 2 at the pre-bid meeting because that discussion was not included in the written meeting minutes. Sometime after August 2, 2006, Continental Electric did obtain a copy of Clarification No. 1, which had been prepared by Dowdle, a CSO representative, but Continental Electric maintained that Clarification No. 1 was different than what was contained in the bid documents. According to Walton, Continental Electric had not understood at the time of its bid that any items associated with the generator were to be included in the base bid.

Although the subcontract between Larson and Continental Electric was signed on November 10, 2006, Larson requested Continental Electric to commence work on October 26, 2006. Construction on the project did begin in mid-October 2006. Indiana Military did not dictate the means or methods of construction and did not direct anyone other than Larson, the general contractor with whom Indiana Military had a contract. As explained by John Dunning, Indiana Military's facilities and contract officer for the project in question, there was no provision in the contract with Larson that placed it into privity with any subcontractor that Larson hired.

Indiana Military paid Larson for all the work it performed on the project, and there were no outstanding claims from Larson that related to the project. All disputes between

6

Indiana Military and Larson were to be resolved under Section 5 of the main contract. More specifically, the contract permitted Larson to bring questions to the contracting officer for decision, and if Larson was dissatisfied with the response, it had thirty days to file an appeal to the Governor. Nothing in the contract between Indiana Military and Larson granted appeal rights to any of the subcontractors.

Continental Electric did not ask to discuss with CSO what Alternate 2 included in the main contract until mid-December 2006. Representatives of CSO and Indiana Military met with Continental Electric representatives in accordance with Larson's request after a construction progress meeting on January 11, 2007. CSO representatives explained to Continental Electric that the wiring outside the area marked as Alternate 2 was part of the base bid and if Continental Electric disagreed, Larson was required to file a proposed change order that would include a detailed labor and materials breakdown. CSO and Indiana Military did not receive a change order from Larson or Continental Electric regarding the conduit and wiring, and it was Dowdle's impression that Continental Electric had made some type of estimate error.

On February 8, 2007, Continental Electric wrote to Larson, indicating that it had included all labor and materials associated with the generator in its Alternate 2 bid and that Continental Electric would require a change order in the amount of $207,000 because this was the amount above the cost for the generator quoted to Continental Electric at the time.

At trial, testimony was presented[4] that the exact cost of the wiring in dispute was $206,350. Pursuant to the contract between Larson and Indiana Military, Larson submitted a Request for Information (RFI), to which CSO replied on February 23, 2007, as follows:

> Request - Please furnish the scope of work demarcation between Base Bid and Alternate No. 2 - Diesel Generator. Please provide reference to all pertinent specifications and drawings.

Tr. Ex. 12.

In essence, CSO explained that the generator and its components were part of Alternate No. 2, but that everything else associated with wiring the project was connected with the base bid or something other than Alternate No. 2 based on the electrical site plan and various sections of the Project Manual.

Larson did not dispute CSO's explanation and Larson advised that it agreed with CSO's interpretation and that it was proceeding with the work based on that explanation. The work was done as explained by CSO. Continental Electric submitted no change order relating to the work on the base bid; nor did it submit any detailed document breaking down materials and labor that would have supported a change order. Tr. 206-07, 213-15.

On February 28, 2007, Continental Electric sent a letter to Larson, informing it that it did not believe that the base bid included the wiring for the generator. The State contracting officer explained that even though the generator was listed as an alternate,

---

[4] The testimony at the trial that commenced on August 2, 2011, is discussed infra in greater detail.

8

even if the generator was not installed, the owner would expect that the wiring to the generator would be installed, so that it would not need to be installed at a later time. Moreover, a generator was never actually considered to be an item that would not be installed because installation was required to permit occupancy of the facility, so that it was not an alternate except in the sense of how the project was bid. The generator was an essential component of the project, as it was part of an emergency backup system.

It was undisputed that Continental Electric was paid for purchasing the generator under a separate contract, and there was no evidence that Continental Electric was not fully compensated as specified in that separate contract. In fact, the generator was installed by Continental Electric before the construction of the facility was completed.

Thomas Walter, a vice president and owner of Larson, testified that only Larson, and not Continental Electric, had appeal rights under Larson's contract with Indiana Military. In the subcontract between Larson and Continental Electric, Walter indicated that in Larson's view, Continental Electric was given a choice regarding disputes. It was Larson's understanding of its subcontract with Continental Electric that with regard to Continental Electric's concerns regarding conduit and wiring, Continental Electric could permit Larson to pursue dispute resolution under the prime contract, or Continental Electric could seek mediation or arbitration of claims with Larson.

At Continental Electric's request, Larson did submit an RFI to CSO asking it to answer a question about what was included in Alternate Number 2. Larson did not consider the matter to be in dispute at that time. When CSO explained what was included

9

in Alternate 2, Larson agreed with that interpretation and sent the following Project

Memorandum to Continental Electric on March 7, 2007:

> As a follow-up to our telephone discussion yesterday morning, I offer the following: The Architect has provided an interpretation of the documents relative to the demarcation between base bid and Alternate No. 2 work in the response received to [Larson] RFI No. 67 (see attached) forwarded to Continental via email on 3.2.07. [Larson] has spoken with two other electrical subcontractors from whom bid proposals were received on bid day for this project. Both provided interpretations of the bid documents identical to the Architect's. Larson-Danielson has reviewed the documents and agrees with the interpretations provided by the Architect.
>
> The contractual mechanism (Larson-Danielson RFI No. 67) to define the scope of work with regard to this issue has been utilized. Larson-Danielson is not required to submit a claim to the Owner which we believe to be untenable. As stated above, Larson-Danielson agrees with the interpretation provided by the Architect and disagrees with the assertions made by Continental Electric regarding this work. Therefore, this represents a dispute between Larson-Danielson (Contractor) and Continental Electric (Subcontractor) and is governed by the provisions in Paragraph 6.1.6 of the subcontract agreement.
>
> As provided in Paragraph 6.3 of the subcontract agreement your firm is directed to proceed with performance of the Subcontract Work. Please feel free to contact me if you should have questions.
>
> Signed David Hehemann (for Larson)

Tr. Ex. 2.

Continental Electric did not seek mediation or arbitration under paragraph 6.1.6 of

the subcontract. Instead, at Continental Electric's urging, Larson asked CSO to forward a

10

claim to the Contracting Officer to decide what was included in Alternate No. 2. The Contracting Officer agreed with the CSO's interpretation and did not grant the claim.

When Continental Electric received Larson's letter informing it that it agreed with the CSO, Walton, then a Vice-President for Continental Electric, wrote to Larson setting out Continental Electric's interpretation that Alternate No. 2 did not clearly include the conduit and wiring from the facility to the generator and stating that a change request should be submitted to the owner.

On April 16, 2007, Hehemann—Larson's representative—replied by email to Walton of Continental Electric and suggested that Continental Electric attempt to work out this issue directly with the owner. However, Hehemann also stated that "prior to addressing any claim directly to the Owner please outline, in detail Continental Electric's plan and the contract language that would allow such a claim procedure." Tr. Ex. 15, p. 229. Continental Electric responded to Larson on May 4, 2007, asking Larson to submit Continental Electric's dispute to the contracting officer in accordance with Article 5 of the subcontract.

On May 18, 2007, Larson asked the State Contracting Officer (then John Dunning) to render a decision regarding the scope of Alternate No. 2 at the request of Continental Electric. Dunning submitted his decision on June 1, 2007. In material part, Dunning's decision provided that

> After reviewing the documents, and the presented discussions, it is the opinion of the State Contracting Officer that Alternate #2 to the base bid for the Limited Army Aviation Support Facility consists of the providing, and

11

installation, of a generator and its immediate components (i.e. battery charger, tank, muffler, exhaust pipe, enclosure, annunciator, and battery). Alternate #2 does not include the wiring between the Limited Army Aviation Support Facility and any generator that might be installed.

E002 clearly defines Alternate #2. Alternate #2 is represented by an encircling line that is clearly connected to a labeled box. The wiring is clearly outside of the encircling line, and as such is not part of Alternate #2. Since the concrete generator pad is inside the encircling line, special emphasis was made to ensure that the contractor was aware that the concrete generator pad was to be provided regardless of any decision concerning Alternate #2.

Tr. p. 232 (emphasis added).

As set forth above, Alternate No. 2 was defined in the Project Manual, and under a particular section, Alternate Number 2 did not include the conduit, wiring, etc., from the facility to the generator pad. Part 2.11(F) of the section referred only to wiring within the area of the generator pad. Dunning's decision was consistent with Larson's bid, which described Alternate No. 2 as only "Diesel Generator: Provide diesel generator as specified in Section 16231, Packaged Engine Generators, and as shown on Drawings C106, E002, and E100" and "Concrete generator pad shall be included in base Bid." Tr. p. 289.

Dunning also explained that while there was a range of bids relating to Alternate No. 2 that did not mean that the subcontractors had misunderstood the bid documents in the Project manual. Specifically, he pointed out that contractors might vary their bids for a variety of reasons relating to their particular strategies in the bidding process to attempt to entice the contracting party to use their services. It was explained that the wiring for

12

the generator was separate from the generator itself, with the owner designating the wiring for the generator as part of the base project, while the generator itself was an alternate.

After Dunning submitted his written decision on June 1, 2007, Larson did not indicate that it disputed his decision, and it did not file an appeal with the Governor. However, Continental Electric appealed to the Governor within the thirty-day limit under the main contract. The Office of the Adjutant General responded to Continental Electric's appeal with a letter, dated August 30, 2007, informing Continental Electric that it did not have the authority to appeal to the Governor because there was no contract between Indiana Military and Continental Electric, and only Larson, the general contractor, had a right to appeal to the Governor in accordance with Larson's contract with Indiana Military. The letter also stated that:

> [Larson] has privity of contract with [Indiana Military] and has the right to use this process if a dispute exists. Representatives from Larson indicate that no dispute exists from them and that no appeal is forthcoming from them. The appeal file[d] with the Governor is moot at this point as there is no legitimate legal foundation upon which to file such an appeal. The only appropriate entity that has privity of contract to file such an appeal is the General Contractor, Larson. . . .

Ex. 20.

On March 10, 2008, Continental Electric filed its complaint in the trial court against Indiana Military, claiming that it had performed all work under the contract and it had not been paid all of the funds that were owed to it. Thus, Continental Electric claimed that Indiana Military breached the contract and was owed an amount of

13

$207,000, plus costs, and post and pre-judgment interest. Continental Electric also made a claim for quantum meruit, contending that Indiana Military accepted the benefits that it provided, despite the opportunity to decline them, and that Continental Electric had not been paid for its work.

Finally, Continental Electric claimed that it was denied due process because the main contract provided a remedy and appeals process to it and Governor Daniels's refusal to respond to the appeal constituted a denial of due process. On the other hand, Continental Electric claimed that if the response from the Adjutant General constituted the response from Governor Daniels, it was denied "fair process" because it was left with no forum to assert its claim and no remedy was available. Appellants' App. p. 26.

A bench trial was held on August 2 and 3, 2011. At trial, Dunning testified that even though the generator was listed as an alternate and was not installed, the owner would expect that the wiring to the generator would occur so that it would not need to be installed at a later time. Moreover, a generator was never actually considered to be an item that would not be installed because the placement of such an item was required to permit occupancy of the facility, so that it was not an alternate, except in the sense of how the project was bid.

Dunning further testified that any responsible electrical contractor would know that the generator was going to be installed. And the generator was an essential component of the project because it was part of an emergency backup system. It was undisputed that Continental Electric was paid for purchasing the generator in question

14

and installing it pursuant to separate contract with another company, and there was no evidence that Continental Electric was not fully compensated as specified in that separate contract. This generator was installed by Continental Electric before the construction of the facility was completed.

It was Larson's understanding of its subcontract with Continental Electric that with regard to Continental Electric's concerns regarding conduit and wiring, Continental Electric could permit Larson to pursue dispute resolution under the main contract as Larson deemed appropriate, or Continental Electric could seek mediation or arbitration of claims with Larson. At Continental Electric's request, Larson did submit an RFI to CSO, asking it to answer a question about what was included under Alternate No. 2. Larson did not consider the matter to be in dispute at that time, and when CSO explained what was included in Alternate No. 2, Larson agreed with that interpretation and sent a Project Memorandum to Continental Electric explaining its position.

Continental Electric understood that it was bound by the terms of the main contract under paragraphs 6.1.1 and 6.1.2 pursuant to the subcontract with Larson. And in accordance with paragraph 6.6 of the subcontract, Continental Electric pursued an appeal with the Governor. As noted above, the State responded to Continental Electric's appeal with a letter, dated August 30, 2007, from the Adjutant General to counsel for Continental Electric and informed it that it lacked the authority to appeal to the Governor because there was no contract between Indiana Military and Continental Electric.

15

On August 10, 2011, the trial court entered findings of fact, conclusions of law, and judgment, determining that Continental Electric was entitled to recover under its unjust enrichment claim. The trial court also found that Indiana Military was in breach of contract by refusing to participate in an administrative appeal. As a result, the trial court awarded Continental Electric a total of $206,350 plus costs. Indiana Military now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

This action was tried by the court, and findings of fact and conclusions of law were entered when the judgment was rendered. Where a party has requested specific findings and conclusions, we apply a two-tiered standard of review. Encore Hotels of Columbus, LLC v. Preferred Fire Prot., 765 N.E.2d 658, 661 (Ind. Ct. App. 2002). We must first determine whether the evidence supports the findings. Id. Then, we will determine whether the findings support the judgment. Id. We have previously determined that in reviewing the findings and judgment, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. Albright v. Bogue, 736 N.E.2d 782, 787 (Ind. Ct. App. 2000).

The findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. Encore Hotels, 765 N.E.2d at 661. We have stated that a clearly erroneous finding of fact occurs "when the record contains no facts to support them either directly or by inference," while a clearly erroneous judgment occurs

16

when it applies the wrong legal standard to the properly found facts. Town of New Ross v. Ferretti, 815 N.E.2d 162, 166 (Ind. Ct. App. 2004). We will disturb the judgment only when there is no evidence to support the findings or the findings fail to support the judgment. Encore Hotels, 765 N.E.2d at 661. Also, we will not reweigh the evidence or assess the credibility of witnesses, and we will affirm the trial court unless the evidence, when viewed in a light most favorable to the judgment, points uncontrovertibly to an opposite conclusion. In re Estate of Wade, 768 N.E.2d 957, 962 (Ind. Ct. App. 2002).

## II. Indiana Military's Claims

Indiana Military argues that the trial court erred in determining that Continental Electric was entitled to recover damages against it because the Indiana Military had no contract with Continental Electric, it had fully paid Larson, and it was not unjustly enriched at Continental Electric's expense.

## A. Breach of Contract

In addressing Indiana Military's breach of contract claims, we note that it is a fundamental proposition that the requirements for a contract or holding a party responsible for contract obligations is offer, acceptance, consideration, and a meeting of the contracting minds. U.S. Bank, N.A. v. Integrity Land Title Corp., 907 N.E.2d 616, 622 (Ind. Ct. App. 2010).

In Ochoa v. Ford, 641 N.E.2d 1042, 1044 (Ind. Ct. App. 1994), we determined that

17

[A] contract is formed by the exchange of an offer and acceptance between contracting parties. The failure to demonstrate agreement on essential terms of a purported contract negates mutual assent and hence there is no contract. The parties to a contract have the right to define their mutual rights and obligations, and a court may not make a new contract for the parties or supply missing terms under the guise of construing a contract. Also, the meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract.

In Conclusion of Law Number forty, the trial court stated that "[i]n the instant case, Continental's contract with Larson required that Continental utilize the dispute mechanism contained in Larson's contract with the Owner" and that "Larson's contract with the Owner was incorporated by reference in Continental's contract with Larson." Appellants' App. p. 19. The trial court concluded that Indiana Military was liable to Continental Electric because Indiana Military refused to participate in Continental Electric's administrative appeal.

Notwithstanding these conclusions, the evidence demonstrates that Indiana Military was not a party to any contract with Continental Electric, had no agreement to do anything with Continental Electric, and there was never any meeting of the minds between contracting parties that would permit a recovery by Continental Electric against Indiana Military. Second, absolutely no provision in the contract between Indiana Military and Larson granted Continental Electric any appeal rights to the Governor.

More specifically, Indiana Military entered into a contract only with Larson and did not have any contractual relationship with any of the subcontractors that Larson hired. Tr. p. 274-75, 277. Indiana Military did not dictate the means or methods of construction

18

and did not direct anyone other than Larson, the general contractor with whom Indiana Military had a contract. Id. at 277-78. And there is no evidence that the Indiana Military contract with Larson put it into privity with any subcontractor that Larson hired. Id. at 279. Therefore, because there was no contract between Indiana Military and Continental Electric, Indiana Military could not breach any contract term in a subcontract to which it was not a party and did not negotiate. That said, if Continental Electric had any claim for breach of contract, it was against Larson, with whom it had a contract, not Indiana Military with whom it had no contract.

We note that Article Six of the subcontract provides that the subcontractor was bound by dispute resolution procedures in the main contract. However, that does not mean that Indiana Military agreed that Continental Electric had any rights to appeal to the Governor. In our view, such a provision means that Continental Electric entered into an agreement with Larson whereby Larson would decide whether it would appeal to the Governor if Continental Electric raised any issues with Larson that might need to be addressed by Indiana Military. Put another way, nothing in the contract between Indiana Military and Larson granted any appeal rights to subcontractors under the contract between Larson and Indiana Military. And there was no agreement that Indiana Military would entertain any appeals directly from subcontractors.

As noted above, when Continental Electric directly appealed to the Governor contrary to the terms of the agreement between Larson and Indiana Military, Indiana Military responded to the unauthorized appeal with a letter, dated August 30, 2007, from

19

the Adjutant General to Continental Electric's counsel that it lacked the authority to appeal to the Governor because there was no contract between Continental Electric and Indiana Military. The letter made it clear that only Larson—the general contractor—had a right to appeal to the Governor pursuant to Larson's contract with Indiana Military. Tr. p. 31; Ex. 20.

Given these circumstances, Continental Electric had no contractual basis for recovering against the State on a theory that the State somehow breached a subcontract to which it was not contracting party. In addition to the fact that there was no contract between Indiana Military and Continental Electric, a review of the contract between Indiana Military and Larson shows that Indiana Military did not agree that it would entertain any appeals directly from subcontractors. Any appeals under the Indiana Military/Larson contract were required to be initiated and pursued by Larson.

In our view, the language and intent of Section 5 of the Indiana Military/Larson contract was clear. Moreover, as there was no contractual relationship between Indiana Military and Continental Electric, there was nothing in the language that could be construed against Indiana Military. MPACT Constr. v. Superior Concrete Constructors, 802 N.E.2d 901, 907-09 (Ind. 2004). Further, Continental Electric could not directly enforce the provisions of the contract between the State and Larson, because nothing in that contract gave rights to subcontractors with respect to appeals to the Governor. Midwest Indemnity Co. v. System Builders, 801 N.E.2d 661, 670 (Ind. Ct. App. 2004). The contract between Indiana Military and Larson did not indicate that it intended any

20

benefit to subcontractors relating to appeals to the Governor, and the contract terms between Indiana Military and Larson imposed no duty on either Indiana Military or Larson in favor of the subcontractors relating to potential appeals of disputes.

To the extent that Larson imposed some obligations on itself with respect to Continental Electric that related to dispute resolution, such a purported agreement did not include Indiana Military, and Continental Electric's contract remedy, if any, was against Larson. As a result, we conclude that the breach of contract determination of the trial court is clearly contrary to law and should be reversed.

## B. Unjust Enrichment

Because we have concluded that there was no contract between Continental Electric and Indiana Military upon which Continental Electric could recover, we next consider Continental Electric's claims of recovery premised upon the theory of unjust enrichment. In Roberts v. Alcoa, Inc., 811 N.E.2d 466, 474-75 (Ind. Ct. App. 2004), a panel of this court explained that the "theory of recovery for unjust enrichment involves the existence of a quasi contract, also known as a contract implied in law." To recover on a claim of unjust enrichment, the plaintiff must establish that a measurable benefit has been conferred on the defendant and the defendant's retention of the benefit without payment would be unjust. Inlow v. Inlow, 797 N.E.2d 810, 816 (Ind. Ct. App. 2004).

When there is a dispute between a subcontractor and a property owner, four criteria are evaluated to determine whether the evidence supports a judgment under a theory of unjust enrichment:

21

1) Whether the owner impliedly requested the subcontractor to do the work; 2) whether the owner reasonably expected to pay the subcontractor, or the subcontractor reasonably expected to be paid by the owner; 3) whether there was an actual wrong perpetrated by the owner; and 4) whether the owner's conduct was so active and instrumental that the owner "stepped into the shoes" of the contractor.

State Dep't of Natural Res. v. CCI, 860 N.E.2d 651, 653 (Ind. Ct. App. 2007).

Here, the undisputed evidence establishes that the State fully compensated Larson for all work done on the project in question. Thus, the trial court erroneously concluded that the four-part test set forth above does not apply in these circumstances. See Appellant's App. p. 17-18. Put another way, the evidence does not support a conclusion that a measurable benefit has been conferred upon Indiana Military under such circumstances that Indiana Military's retention of the benefit without payment would be unjust.

Prior to signing a subcontract with Larson to perform electrical work on the aviation support facility, it was made clear to Continental Electric, and all other concerned companies, that all conduit, wiring and other components between the facility building and the concrete generator pad were part of the base contract and not part of Alternate No. 2. Alternate No. 2, which related to the generator, was discussed at the pre-bid meeting, which was confirmed by Architect Dowdle, through a review of her meeting notes. Tr. p. 166-69. And the relevant provisions in the Project Manual that related to base bids and the alternates were addressed by CSO in 2007. Pursuant to the

22

contract between Larson and Indiana Military, Larson submitted an RFI, to which CSO

replied on February 23, 2007, as follows:

> Request - Please furnish the scope of work demarcation between Base Bid
> and Alternate No. 2 - Diesel Generator. Please provide reference to all
> pertinent specifications and drawings.

Ex. 12; Tr. p. 224.

> CSO then responded, as follows:
>
> Provide everything except for the generator/components of Section 16231.
> Section 16231, per 1.02 "Summary" includes the battery charger, tank,
> engine generator set, muffler, exhaust pipe, enclosure, annunciator and
> battery. These aforementioned items are excluded from the base bid.
> Everything else (conduit, cable, transfer switches, emergency switchboard,
> etc.) is base bid.

Alternate No. 2

> Provide the generator/components of Section 16231, per 1.02 "Summary".
> Note that the Alternate is identified around the generator on the one-line
> diagram on Dwg. E002, yet cable/conduit to generator is specifically
> outside the Alternate identification.

Tr. p. 224, Ex. 12 (emphasis added).

At trial, Dunning testified that the conduit and conductors at issue were not

included in Alternate No. 2. Tr. p. 285. Alternate No. 2 was defined in Section 01230,

3.01(B), of the Project Manual. Tr. p. 95; Ex. 2. And under the referenced Section

16231, part 2.11, Alternate No. 2 did not include the conduit, wiring etc., from the facility

to the generator pad. Tr. p. 288. Part 2.11(F) of Section 16231 referred to wiring within

the area of the generator pad. Id. at 289. Dunning's decision was consistent with

23

Larson's bid, which described Alternate No. 2 as only "Diesel Generator: Provide diesel generator as specified in Section 16231, Packaged Engine Generators, and as shown on Drawings CI06, E002, and E100" and "Concrete generator pad shall be included in base Bid" Tr. p. 146, 289, Ex. 5. Section 16231 does not reference conductors and cables running from the building. Tr. p. 133, 290; Ex. 2. The connectors and cables referenced in Section 16120 of the Project Manual, referred to connectors and cables that ran out to the Alternate No. 2 site. Tr. p. 292.

Dunning further explained that even though there was a range of bids that related to Alternate No. 2, it did not mean that the subcontractors had misunderstood the bid documents in the Project Manual because, as noted above, contractors might vary their bids for a variety of reasons relating to their particular strategies in the bidding process in an attempt to entice the contracting party to use their services. Tr. p. 305-08. In short, nothing that the trial court cited in its findings rebuts the fact that the Project Manual clearly stated that Alternate No. 2 included only the generator and wiring within the box marked as Alternate No. 2.

Additionally, we point out that nothing in Clarification No. 1 set forth above changed the scope of the work that related to the installation of conduit, wiring and components between the facility building and the concrete generator pad. Indeed, the clarification was simply a response to a question.

The evidence at trial establishes that based on the Project Manual—and long before Continental Electric entered into a subcontract with Larson—that Continental

24

Electric should have been fully aware that the conduit, wiring and other components between the facility building and the concrete generator pad were to be installed pursuant to the base bid or base contract. And Larson fully agreed that it was obligated to install all of the electrical components between the building and the concrete generator pad under the base contract, and it informed Continental Electric as much.

In light of the above and contrary to the trial court's conclusions, it was clear that Continental Electric did not meet the four-part test to establish a right of recovery under an unjust enrichment theory. First, Indiana Military did not impliedly request that Continental Electric perform work that Larson was not already required to perform under the contract between Indiana Military and Larson. The evidence establishes that Continental Electric unquestionably knew the scope of the required work before it signed a contract.

Also, it was Larson that directed Continental Electric to proceed with the work. Ex. 9. Indiana Military neither directly nor impliedly required Continental Electric to do any work. Larson directed Continental Electric's work under the subcontract. The trial court apparently believed that Indiana Military required Continental Electric to proceed merely because it answered questions submitted by Larson about the scope of Alternate No. 2. Appellants' App. p. 17, Conclusion 25. However, those answers were not directions to Continental Electric. Rather they were answers to questions from Larson, to which Larson fully agreed. The requirement to proceed was between Larson and

25

Continental Electric. Thus, Continental Electric failed to establish the first element of the test.

Second, the evidence establishes that the State had no expectation that it would be required to pay Continental Electric or Larson any additional amount for wiring between the facility building and the concrete generator pad that Continental Electric fully understood was part of the base contract that it had with Larson. CSO, Indiana Military, Larson, and the other bidding contractors all understood that the wiring in question was part of the base contract from the outset. Also, any expectation by Continental Electric that the State would pay it for installing electrical connections between the facility building and the concrete generator pad is baseless. More particularly, three months before Continental Electric signed any contract it was made clear from the CSO's clarification in August, 2006, that the wiring between the building and the concrete generator pad was part of the base bid and base contract.

We also note that Continental Electric's contentions regarding the scope of work required by the base contract strain credulity. Continental Electric actually claimed at trial that no matter what was stated by the Project Manual, it would have been inappropriate to run wire to the generator pad in circumstances where the generator was an alternate and might not be installed. Tr. p. 82. However, the State contracting officer explained that even though the generator was listed as an alternate, even if the generator was not installed, the owner would expect that the wiring to the generator would be installed, so that it would not need to be placed at a later time. Id. at 298-302, 306-307.

26

The generator was an essential component of the project because it was part of an emergency backup system. Id. at 223. Further, it was undisputed that Continental Electric was paid for purchasing the generator and installing it under a separate contract, and there was no evidence that Continental Electric was not fully compensated as specified in that separate contract. Id. at 142-43, 229. The generator was installed by Continental Electric before the construction of the facility was completed. Id. at 229.

Next, there is no evidence that Indiana Military committed any wrong in this case. Indeed, Indiana Military expected Larson to install the wiring in question, and Larson fully understood that it was obligated to do so. Larson was paid in full by Indiana Military pursuant to their contract. If Continental Electric believed that it had been wronged, it could have pursued mediation or arbitration against Larson under the subcontract because Larson agreed that it was not entitled to additional compensation from Indiana Military. Whether Larson was paid additional amounts or not by Indiana Military, Continental Electric's remedy was against Larson. But Continental Electric did not pursue any such legal remedy. And it did not seek mediation or arbitration as the subcontract had provided. Indiana Military perpetrated no actual wrong in refusing to pay Continental Electric for work that Larson agreed was already required to be completed by its contract with Indiana Military.

Finally, contrary to the trial court's conclusion, there is no showing that Indiana Military accidentally or intentionally stepped into the shoes of Larson, the general contractor. Throughout the construction process, the CSO and Indiana Military simply

27

responded to questions that Larson had submitted. Again, there was no contract between Continental Electric and Indiana Military. When Continental Electric brought its concerns about wiring to the attention of CSO and Indiana Military at a construction meeting in January of 2007, Continental Electric was informed that it was required to submit a detailed change order to Larson that would include a detailed breakdown of labor and materials. However, no change was submitted. Tr. p. 184-85.

We reject the notion that the response from the Adjutant General to Continental Electric's improper appeal to the Governor did not amount to action by Indiana Military stepping into the shoes of Larson. To the contrary, Indiana Military properly responded that it had no contractual relationship with Continental Electric, and that Continental Electric did not have any right to appeal to the Governor under a contract to which it was not a party. Ex. 20.

In sum, we conclude that Continental Electric had no right to recover against Indiana Military. Continental Electric failed to establish that a measurable benefit was conferred on Indiana Military and that its retention of a benefit without payment would be unjust. Indeed, Indiana Military did not receive a measurable benefit from Continental Electric that it had not already paid for.

All concerned, including Continental Electric, knew long before Continental Electric ever entered into a subcontract with Larson that the wiring in question was part of the base contract with Larson and that Indiana Military would expect Larson to install the wiring between the facility building and the concrete generator pad. Larson

28

completed the work, and was fully paid for that work. In short, Indiana Military has not unjustly retained a benefit without payment. For all of these reasons, the trial court's judgment for Continental Electric on the basis of quantum meruit must be set aside.

The judgment of the trial court is reversed.

KIRSCH, J., and BROWN, J., concur.