**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 12 2014, 9:56 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**MARK D. HASSLER**
Hunt, Hassler, Lorenz & Kondras, LLP
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE:

**STEPHEN J. PETERS**
**WILLIAM N. IVERS**
Harrison & Moberly, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PERSONAL RESOURCE MANAGEMENT, INC., and MARGARET A. DITTEON, | ) ) | |
| Appellants-Plaintiffs, | ) ) | |
| vs. | ) ) | No. 84A01-1304-PL-157 |
| EVANSTON INSURANCE COMPANY, | ) ) | |
| Appellee-Defendant. | ) ) | |

APPEAL FROM THE VIGO SUPERIOR COURT
The Honorable David R. Bolk, Judge
Cause No. 84D03-1105-PL-3628

**March 12, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

Personal Resource Management, Inc. ("PRM") and Margaret A. Ditteon (collectively "the Insureds") appeal the trial court's entry of summary judgment in favor of Evanston Insurance Company on the Insureds' complaint alleging breach of contract and seeking damages and a declaration that claims they submitted are covered under two professional liability policies issued by Evanston. The Insureds present five issues for review, which we consolidate and restate as whether the trial court erred when it granted summary judgment and declaratory judgment in favor of Evanston. We affirm.

## FACTS AND PROCEDURAL HISTORY

The trial court entered extensive findings in this matter explaining the facts and issues, which, to the extent they are undisputed, we reproduce here:

**A.      PRM Formation and Business Operation.**

11.    In 1990, Margaret A. Ditteon and her former partner Judy Eifert formed Personal Resource Management; Ditteon became the sole owner of PRM in 1995. The services provided by PRM to the elderly changed and expanded to include representation as a power of attorney, representation as a guardian, and if no other family member was available, representation as personal representative of an estate. PRM would serve as both a guardian of the person and a guardian of the person's financial affairs.

**B.      PRM's Undisclosed Pre-Existing Potential Claims.**

12.    In September of 2006, Ditteon contacted Valerie Kinnaman of Tatem & Associates, PRM's agent since at least 2002 to inquire about E & O [(Errors and Omissions)] coverage. Ditteon reported a potential claim involving the failure to pay insurance coverage with respect to an individual over whom they [sic] were appointed guardian. The carrier denied the claim, as the policy did not provide coverage for the loss.

13.    In November of 2006, a guardianship proceeding was filed in the Parke Circuit Court under Cause Number 61C01-0611-GU-22. PRM was appointed as guardian for Charles E. Mitchell and eventually was required to

post a $2,000,000.00 bond. Ditteon assigned Jan Riddle to serve as the case manager for Mr. Mitchell until he died in April of 2008.

14. In May of 2008, Ditteon discovered that Riddle had engaged in wrongful acts and embezzled from Mr. Mitchell's guardianship.

15. An estate was opened on May 7, 2008, and the Court appointed Ditteon/PRM as the personal representative of the supervised Estate of Mitchell in Vigo County under Cause Number 84D03-0804-ES-03954.

## C. **PRM Insurance Application and Ditteon Misrepresentations.**

16. On September 9, 2008, Ditteon asked her insurance agent, Kinnaman, about adding employee dishonesty coverage to PRM's policy. Kinnaman advised that, due to the existence of a pending claim, they would be unable to obtain coverage.

17. Ditteon also inquired about professional liability coverage. Kinnaman was unable to find coverage through any of Tatem's insurance carriers.

18. However, in December of 2008, Kinnaman was able to obtain a quote for professional liability insurance through JM Wilson, a surplus lines broker, who obtained a quote from Evanston, an authorized surplus lines company. Ditteon chose not to purchase the coverage at that time.

19. On July 15, 2009, Ditteon reviewed and signed an updated application for insurance coverage.

20. The application represented that the only professional services performed by PRM were as follows:

"Case Managers—paying bills. They are individual guardians for people. The owner Marge is the only person that signs checks and is the case manager.

Percent of Gross Revenues—100%"

The claims history section of the application asked the following question:

"During the last five years, have there been any professional liability claims against the applicant, its predecessors, subsidiaries, affiliates, employees and/or against any other person or entity proposed for this insurance."

PRM/Ditteon responded "No" to the question.

The application also asked the following questions:

"Is(are) any person(s) or entity(ies) proposed for this insurance aware of any fact, circumstance or situation which might afford grounds for any claim, such as would fall under the proposed insurance?"

Again, Ditteon and PRM responded "No."

21.     The application further included the following language:

NOTICE TO THE APPLICANT—PLEASE READ CAREFULLY
No fact, circumstance or situation indicating the probability of a claim or action for which coverage may be afforded by the proposed insurance is now known by any person(s) or entity(ies) proposed for this insurance other than that which is disclosed in this application. It is agreed by all concerned that if there be knowledge of any such fact, circumstance or situation, any claim subsequently emanating therefrom shall be excluded from coverage under the proposed insurance.

The policy applied for is SOLELY AS STATED IN THE POLICY, if issued, which provides coverage on a "CLAIMS MADE" basis for ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD, unless the extended reporting period option is exercised in accordance with the terms of the policy. The policy has specific provisions detailing claim reporting requirements.

**D.     Issuance of Evanston 2009 Policy and 2010 Renewal Policy.**

22.     Evanston issued a policy of insurance to PRM for the policy period covering July 15, 2009, to July 15, 2010, with a retroactive date of July 15, 2009 (the "2009 Policy").

23.     Kinnaman forwarded the policy and in her transmittal letter emphasized "your policy may contain certain conditions, exclusions or limitations, so it is important for you to read it." The 2009 Policy also contained a notice.

24.     The application signed by Ditteon was attached to and made a part of the policy.

25.     The 2009 Policy was thereafter renewed, as Policy No. EO-843441, for the policy period from July 15, 2010, to July 15, 2011, with a retroactive

4

date of July 15, 2009 (the "2010 Policy"). The July 15, 2009 application also was attached and made a part of this policy.

26. The 2009 Policy and 2010 Policy were issued on a "Claims Made and Reported" basis with liability limits of $500,000.00 per claim and $1,000,000.00 in aggregate.

**E.     The Pertinent Policy Provisions.**

27. In relevant part, the 2009 Policy and 2010 Policy each include the following provisions:

**Service and Technical Professions Professional Liability Insurance Policy**

THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.

In consideration of the premium paid, the undertaking of the Named Insured to pay the Deductible as described herein and in the amount stated in the Declarations, in reliance upon the statements in the application attached hereto and made a part hereof and the underwriting information submitted on behalf of the Insured, and subject to the terms, conditions and limitations of this policy, the Company and the Insured agree as follows:

* * *

**INSURING AGREEMENT**

A.     The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount . . . as a result of a Claim first made against the Insured during the Policy Period . . . , by reason of:

1.     a Wrongful Act; or

2.     a Personal Injury;

in the performance of Professional Services rendered . . . ,

provided:

(i)     the Wrongful Act or Personal Injury happens during the Policy Period or on or after the Retroactive Date stated in Item 7 of the Declarations and before the end of the Policy Period; and

5

(ii)   prior to the effective date of this policy <u>the Insured had no knowledge of such Wrongful Act or Personal Injury or any fact, circumstance, situation or incident which may have led a reasonable person in the Insured's position to conclude that a Claim was likely</u>.

\* \* \*

## DEFINITIONS

A.   **Claim** means the Insured's receipt of:
1.   a written demand for money damages or remedial Professional Services involving this policy; or

2.   the service of suit or institution of arbitration proceedings against the Insured;

provided, however, Claim shall not include Disciplinary Proceeding.

\* \* \*

J.   **Professional Services** means those services stated in Item 4 of the Declarations rendered for others for a fee.

\* \* \*

M.   **Wrongful Act** means any negligent act, error or omission in Professional Services.

\* \* \*

## THE EXCLUSIONS

This policy does not apply to any Claim:

\* \* \*

O.   <u>based upon or arising out of</u> any conversion, <u>misappropriation</u>, commingling of or defalcation <u>of funds</u> or property;

P.   <u>based upon or arising out of any inability or failure of any party to pay or collect monies or to collect or pay</u> federal, state, county or local <u>tax</u>, including, but not limited to, income tax, sales tax or property tax;

6

* * *

R.     <u>based upon or arising out of the: (1) preparation of a financial statement, if a compilation</u>, review or audit; or (2) performance of any analytical analysis for the purpose of preparing a financial statement, if a compilation, review or audit.

* * *

## OTHER CONDITIONS

* * *

B.     Representations: By acceptance of this policy, the Insureds agree as follows:

    1.     that the information and statements contained in <u>the application(s) are</u> the basis of this policy and are to be considered as incorporated into and constituting a <u>part of this policy</u>; and

    2.     that <u>the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Company</u> under this policy, and that <u>this policy is issued in reliance upon the truth of such representations</u>.

* * *

## DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

**A.     Defense, Investigation and Settlement of Claims**:

1.     The Company shall have the right and duty to defend and investigate any Claim to which coverage under this policy applies . . . .

* * *

In the 2010 Policy, the following provisions were included:

## RELIANCE ON APPLICATION PROVISION

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

7

1. Section Conditions Precedent is deleted and replaced as follows:

In consideration of the premium paid, the undertaking of the Named Insured to pay the Deductible as described herein and in the amount stated in the Declarations, in reliance upon the statements in the application attached to [the 09-10 Policy] and also made a part hereof and the underwriting information submitted on behalf of the Insured, and subject to the terms, conditions and limitations of this policy, the Company and the Insured agreed as follows:

2. Section Other Conditions B, Representations, is deleted and replaced as follows:

B. **Representations**: By acceptance of this policy, the Insureds agree as follows:

1. that the information and statements contained in the application(s) for the [09-10 Policy], a copy of which is attached hereto, are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and

2. that the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Company under this policy, and that this policy is issued in reliance upon the truth of such representations.

## F. PRM Notice of Potential Claim and Evanston's Response.

28. On June 17, 2010, Plaintiffs, by counsel, sent a letter to Evanston advising of a "potential claim." Glenn Fischer reviewed and investigated the potential claim and spoke with Ditteon.

29. On July 15, 2010, Evanston issued a response to Mr. Hassler's June 17, 2010[,] letter stating no insurance coverage was triggered, as "no Claim arising out of the Insured's Professional Services (as those terms are described by the policy) has been made against the insured at this point in time."

## G. PRM's Notice of the Mitchell Guardianship and Mitchell Estate Claims and Evanston's Coverage Denial Letter.

30.     On October 13, 2010, Plaintiffs' counsel tendered for defense and indemnity to Evanston a complaint and other filings in an action entitled "First Financial Bank, et al v. Personal Resource Management, Inc., et al." in the Parke Circuit Court under Cause No. 61C01-0611-GU-22 (the "Mitchell Guardianship").

31.     This lawsuit asserted claims related to the handling of Mitchell's assets and the wrongful conduct of Jan Riddell. Ditteon was aware of these wrongful acts in May of 2008, but did not disclose them in the application.

32.     On October 21, 2010, the Plaintiffs' counsel forwarded to Evanston a Complaint for Damages filed in an action entitled "First Financial Bank, et al. v. Margaret A. Ditteon, et al." in the Vigo Superior Court under Cause No. 84D03-0804-ES-3954, (the "Mitchell Estate"), and requested that Evanston defend and indemnify PRM and Ditteon.

33.     PRM and Ditteon did not disclose that they provided estate personal representative services in the application for insurance.

34.     Evanston had Glenn Fischer, a senior claims attorney with Markel Service, Incorporated, review the claims submitted by PRM's counsel.

35.     Fischer reviewed the letters, file materials, the policies, the application and the lawsuit allegations and talked with Ditteon. On October 29, 2010, Evanston issued a denial of coverage letter with respect to the Mitchell Estate Claim.

**H.     PRM's Notice of Mitchell Lawsuit and Evanston's Coverage Denial Letter.**

36.     On February 24, 2011, the Plaintiffs, by counsel, submitted to Evanston a Complaint for Damages filed in an action entitled "First Financial Bank, et al. v. Ditteon, et al.", in Vigo Superior Court under Cause No. 84D03-1011-PL-9720 (the "Mitchell Lawsuit"), which was tendered for defense and indemnification. The Mitchell Estate Claim and Mitchell Lawsuit were consolidated for trial.

37.     On March 7, 2011, after Fischer reviewed and investigated the claim, Evanston again issued a declination of coverage letter.

Appellants' App. at 16-25 (citations to record omitted, emphases original).

9

On May 4, 2011, the Insureds filed a complaint against Evanston and Tatem alleging negligence against Tatem, breach of contract and bad faith against Evanston, and seeking a declaration that Evanston was required to provide a defense, coverage, and indemnity to the Insureds for the actions brought against them in three lawsuits arising from PRM's professional services to Mitchell. The complaint also sought damages and attorney's fees. On July 8, Evanston filed its answer, counterclaim, and third-party complaint seeking a declaration that it owed no coverage to the Insureds under the 2009 Policy or the 2010 Policy.

On October 1, 2012, Evanston filed a motion for summary judgment and designated evidence in support of the motion. On November 16, the Insureds filed a brief in response and opposition to the motion.[1] Over the Insureds' objection, Evanston filed a reply brief on December 10. On December 13, the trial court held a hearing on the summary judgment motion, and on March 27 the court entered summary judgment and declaratory judgment in favor of Evanston ("Summary Judgment Order"). The trial court concluded that Evanston was entitled to summary judgment because: (1) the request for coverage does not fall within the insuring agreements of either the 2009 Policy or the 2010 Policy; (2) the application submitted by Ditteon and PRM contained material misrepresentations of fact; and (3) no coverage exists for the Insureds' claims under Exclusion O, P, and R of the policies. And, based on those conclusions, the court further concluded that Evanston was entitled to summary judgment on the Insureds' bad faith and punitive damage claims. The Insureds now appeal.

---

[1] The Insureds settled their claim against Tatem and the trial court dismissed Tatem from the action on November 20, 2012.

10

## DISCUSSION AND DECISION

### Standard of Review

Our standard of review of summary judgment is well-established:

> When reviewing a grant or denial of a motion for summary judgment our standard of review is the same as it is for the trial court. Kroger Co. v. Plonski, 930 N.E.2d 1, 4 (Ind. 2010). The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." Gill v. Evansville Sheet Metal Works, Inc., 970 N.E.2d 633, 637 (Ind. 2012). Summary judgment is improper if the movant fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. Id. In determining whether summary judgment is proper, the reviewing court considers only the evidentiary matter the parties have specifically designated to the trial court. See Ind. Trial R. 56(C), (H). We construe all factual inferences in the non-moving party's favor and resolve all doubts as to the existence of a material issue against the moving party. Plonski, 930 N.E.2d at 5.

Reed v. Reid, 980 N.E.2d 277, 285 (Ind. 2012).

Here, the trial court made special findings and conclusions thereon in the Summary Judgment Order. Specific findings or conclusions made in a summary judgment order help our review by giving insight into the trial court's rationale, but they do not change our standard of review. Kesling v. Hubler Nissan, Inc., 997 N.E.2d 327, 331-32 (Ind. 2013) (citation omitted). Nor does the trial court's decision to adopt a party's proposed order verbatim affect our review (although we do not encourage that practice). Id. at 332 (citation omitted). In either event, again, our review of summary judgment is de novo, Kovach v. Caligor Midwest, 913 N.E.2d 193, 196 (Ind. 2009), and we apply that standard carefully to ensure that a litigant is not improperly denied a day in court, Tom-Wat, Inc. v. Fink, 741 N.E.2d 343, 346 (Ind. 2001).

## Insurance Policy Construction

The issues on appeal require construction of the professional liability insurance policies issued by Evanston. The goal of contract interpretation is to ascertain and enforce the parties' intent as manifested in the contract. Cotton v. Auto-Owners Ins. Co., 937 N.E.2d 414, 416 (Ind. Ct. App. 2010) (citation omitted), trans. denied. "To that end, '[w]e construe the insurance policy as a whole and consider all of the provisions of the contract[,] not just individual words, phrases, or paragraphs.'" Id. (quoting Gregg v. Cooper, 812 N.E.2d 210, 215 (Ind. Ct. App. 2004), trans. denied).

> Although some "special rules of construction of insurance contracts have been developed due to the disparity in bargaining power between insurers and [insureds], if a contract is clear and unambiguous, the language therein must be given its plain meaning." On the other hand, "'where there is ambiguity, insurance policies are to be construed strictly against the insurer' and the policy language is viewed from the standpoint of the insured." A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms. In insurance policies, "an ambiguity is not affirmatively established simply because controversy exists and one party asserts an interpretation contrary to that asserted by the opposing party."

Bennett v. CrownLife Ins. Co., 776 N.E.2d 1264, 1269 (Ind. Ct. App. 2002) (quoting Beam v. Wausau Ins. Co., 765 N.E.2d 524, 528 (Ind. 2002)) (alteration in original). "Moreover, the proper interpretation of an insurance policy, even if it is ambiguous, generally presents a question of law that is appropriate for summary judgment." Bennett, 776 N.E.2d at 1269 (citing Bosecker v. Westfield Ins. Co., 724 N.E.2d 241, 243 (Ind. 2000)).

The insurance policy at issue in this case is a "claims made" policy. We have described such policies as follows:

> Conventional liability insurance policies are "occurrence" policies. "Occurrence" policies link coverage to the date of the tort rather than of the suit. Thus, "occurrence" policies protect the policyholder from liability for

any act done while the policy is in effect. [Generally, a] "claims made" policy links coverage to the claim and notice rather than the injury. Thus, a "claims made" policy protects the holder only against claims made during the life of the policy. Both an [sic] "occurrence" and "claims made" insurance policies require the insured to promptly notify the insurer of the possible covered losses. The notice provision of a "claims made" policy is not simply the part of the insured's duty to cooperate, it defines the limits of the insurer's obligation. If the insured does not give notice within the contractually required time period, there is simply no coverage under the policy.

Paint Shuttle, Inc. v. Cont'l Cas. Co., 733 N.E.2d 513, 522 (Ind. Ct. App. 2000) (internal footnotes and citations omitted), trans. denied; see also Ashby v. Bar Plan Mut. Ins. Co., 949 N.E.2d 307, 312 (Ind. 2011). Or, as Judge Posner has explained:

Whereas an occurrence policy protects the insured against the financial consequences of an accident or other liability-creating event that occurs during the policy period, no matter when the claim is made—it might be many years later—a claims-made policy protects the insured against the financial consequences of a legal claim asserted against him during the policy period. Sol Eroll, "The Professional Liability Policy 'Claims Made,'" 13 Forum 842 (1978); Comment, "'Claims-Made' Liability Insurance: Closing the Caps with Retroactive Coverage," 60 Temple L.Q. 165 (1987). . . . For protection against old occurrences the insured must look to his occurrence policies. Claims-made policies that lack retroactive coverage are attractive mainly to new entities . . . or young professionals just beginning their careers. They don't need retroactive coverage.

Truck Ins. Exch. v. Ashland Oil, Inc., 951 F.2d 787, 790 (7th Cir. 1992).

Here, in June 2010, Mitchell's heirs filed a petition to remove the Insureds as the personal representative of Mitchell's estate. In the following months, the heirs and the successor personal representative filed three lawsuits against the Insureds and others, based in relevant part on the Insureds' performance as Mitchell's guardian and as personal representative of his estate. The Insureds submitted for coverage: (1) the petition to remove Ditteon, doing business as PRM, as personal representative of the Mitchell estate,

13

filed in June 2010; (2) the complaint filed in the Parke County guardianship case alleging PRM's misfeasance and malfeasance as Mitchell's guardian ("Guardianship Complaint" or "Case GU-22"), filed in October 2010; (3) a complaint filed in the Mitchell estate case in Vigo Superior Court 3 by the successor personal representative alleging misfeasance and malfeasance by Ditteon and PRM as personal representative of Mitchell's estate ("Mitchell Estate Complaint" or "Case ES-3954"), also filed in October 2010; and (4) a complaint filed in Vigo Superior Court 3 by Mitchell's heirs against the Insureds, also alleging misfeasance and malfeasance by Ditteon and PRM as personal representative of Mitchell's estate ("Mitchell Lawsuit Complaint" or "Case PL-9720"), filed in February 2011.  The Guardianship Suit was eventually transferred from Parke County to Vigo Superior Court 3, where both the Mitchell Estate and the Mitchell Lawsuit were pending. All three actions have since been consolidated.[2]

The Insureds contend that the trial court erred when it granted summary judgment and declaratory judgment in favor of Evanston.[3]  They argue that the trial court erred when it reached the conclusions that Evanston owed no coverage or duty to defend because:  (1) the claims tendered by the Insureds to Evanston fell outside the scope of coverage of both professional liability policies; (2) the Insureds had failed to timely notify Evanston of the

---

[2]  The Chronological Case Summary ("CCS") for the Guardianship Case shows that it was transferred to Vigo Superior Court 3 in November 2010, but the record on appeal does not show clearly that the cases were consolidated.  Evanston states that the Guardianship Case was "made part of the Mitchell Estate," Appellee's Brief at 12, and that the Mitchell Estate and the Mitchell Lawsuit were consolidated for trial.  Because the parties treat the cases as consolidated and given the lack of evidence to the contrary in the record on appeal, we treat the three underlying cases as if they have been consolidated.

[3]  The Insureds do not appeal Evanston's determination that the petition to remove them as personal representative of Mitchell's estate is not a "claim" as defined under the Policies.  Therefore, at issue on appeal are only Evanston's decisions to deny defense, indemnification, and coverage for the three lawsuits the Insureds submitted.

14

claims; (3) the Insureds did not comply with the Discovery Rule in the 2009 Policy and the 2010 Policy (collectively "the Policies"); (4) the Insureds made material misrepresentations on the policy application; (5) the claims are excluded under Exclusions O, P, and R; and (6) the Insureds have not shown bad faith by Evanston and are not entitled to punitive damages as a matter of law. We conclude below that the first two issues are dispositive and, therefore, need not address the others.

**Scope of Coverage**

The Insureds first contend that the trial court erred when it concluded as a matter of law that the claims submitted were not covered under the 2009 Policy or the 2010 Policy. In particular, the Insureds assert that the trial court erroneously determined that the Policies provided coverage for claims regarding only guardianship services. In support, they argue that, although the Declarations Page of the Policies defines the "professional services" covered as "Court[-]Appointed Guardians[,]" Appellant's App. at 97, 121, PRM's application for insurance is part of the policy and defines "professional services" more broadly than the Declarations page. As a result, they contend that the policy is ambiguous and requires construction. We must determine whether the definition of "Professional Services" in the Policies is ambiguous.

The Policies provide in relevant part:

Insuring Agreement

A.    The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 6 of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company during the Policy Period or after the Extended Reporting Period, if exercised, or within

15

sixty (60) days after the expiration date of the Policy Period or Extended Reporting Period, if exercised,

by reason of:

1.      a Wrongful Act; or

2.      a Personal Injury;

in the performance of Professional Services rendered or that should have been rendered by the insured or by any person or organization for whose Wrongful Act or Personal Injury the Insured is legally responsible . . . .

Appellants' App. at 103, 127.  The Policies define "Professional Services" as "those services stated in Item 4[] of the Declarations rendered for others for a fee."  Id. at 105, 129.  And Item 4 of the Declarations states:  "Professional Services:  Court[-]Appointed Guardian."  Id. at 97, 121.  The Policies clearly and unambiguously define "Professional Services" as "Court[-]Appointed Guardian."  Id. at 97, 121.

Still, the Insureds argue that the application for coverage is incorporated into the Policies and, therefore, must also be considered in order to construe the meaning of "Professional Services."  They further point out that the policy provides that all information on the application is "material."  Appellants' Brief at 21.  The Insureds misread the Policies.

The Insureds are correct that the application for each policy is "incorporated into and constitut[es] a part" of each policy.  Id. at 111, 135.  And on the application for each policy, Ditteon, as president of PRM, described the company's professional services as follows:  "Case Managers - Paying bills, they are individual guardians for people.  The owner, [Ditteon], is the only person that signs checks & is the case manager."[4]  Id. at 117,

_____

[4]  The Insureds quoted this language from the insurance application in their brief on appeal but provided no citation to the record.  We observe that the same application, dated July 15, 2009, is attached to both of the Policies.

16

141. But, while the Policies incorporate the application, they do not state that the application modifies or supersedes the terms or definitions in the Policies. And with regard to the materiality of the information on the application, the Policies provide that such is "material to the acceptance of the risk or hazard assumed by [Evanston,]" not material to the definitions or other terms of the Policies. Appellants' App. at 111, 135.

When the meaning of the text is clear, recourse to other provisions of the contract is unnecessary, and we may not forage through the contract looking for other provisions. Claire's Boutiques, Inc. v. Brownsburg Station Partners, LLC, 997 N.E.2d 1093, 1098 (Ind. Ct. App. 2013) (internal quotation marks and citation omitted). Here, the Policies clearly and unambiguously limit the scope of coverage to the Insureds' conduct as court-appointed guardians. Aside from merely asserting that the applications are incorporated into and part of the Policies, the Insureds make no persuasive argument, under the terms of the Policies or under case law, why the contents of the application for insurance would affect the definition of "Professional Services." As such, the Insureds' argument on this point must fail.

We conclude that the Policies unambiguously provide that the scope of coverage is limited to court appointed guardianships, as stated on the Declaration Pages. Thus, we hold that the trial court correctly entered summary judgment in favor of Evanston when it declared that Evanston owed no coverage to the Insureds under the Policies with regard to the non-guardianship claims.

## Policy Periods

We next determine whether there is a genuine issue of material fact regarding whether the claims of wrongful acts alleged in the complaints were made to Evanston within the policy period under either policy. In this regard, the Insureds contend that the trial court based its conclusion that the claims were not made within the policy periods on an allegedly erroneous finding that the guardianship terminated upon Mitchell's death in 2008. As evidence that the guardianship continued after Mitchell's death, they cite Indiana Code Sections 29-3-16-1(e) and 29-3-9-6 to show that a guardian continues to have duties to the guardianship estate beyond the ward's date of death and that the trial court denied a motion filed by Mitchell's heirs in 2010, two years after the death, to close the guardianship. Evanston counters that, in any event, the Insureds did not meet the timeliness requirements in the Policies for the claims to be covered. We agree with Evanston.

Again, the Policies provide, in relevant part:

A. The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount . . . as a result of <u>a Claim first made against the Insured during the Policy Period</u> . . . <u>and reported to the Company during the Policy Period</u> . . . or within sixty (60) days after the expiration of the Policy Period . . . , <u>by reason of</u>:

    1. <u>a Wrongful Act</u>; or

    2. a Personal Injury;

<u>in the performance of Professional Services</u> rendered . . . ,

<u>provided</u>:

    (i) <u>the Wrongful Act</u> or Personal Injury <u>happens during the Policy Period or on or after the Retroactive Date stated in Item 7</u> of the Declarations and before the end of the Policy Period; and

18

> (ii)  prior to the effective date of this policy <u>the Insured had no knowledge of such Wrongful Act or Personal Injury or any fact, circumstance, situation or incident which may have led a reasonable person in the Insured's position to conclude that a Claim was likely</u>.

Appellants' App. at 103, 127 (emphases added).  In other words, to be covered a claim must be made during the policy period[5] <u>and</u> the wrongful act must have "happen[ed]" during the policy period.  <u>Id.</u> at 103, 127.

We have already determined that the Policies covered only professional services that PRM or Ditteon performed as a court-appointed guardian.  Thus, again, we consider only requests for coverage for those claims regarding professional services rendered as Mitchell's guardian.  Although the trial court found that the guardianship terminated when Mitchell died on April 4, 2008, the Insureds designated evidence showing that the guardianship has not been closed to date.  Specifically, the guardianship CCS shows that, on August 20, 2010, the trial court ordered "First Financial Bank to transfer the Guardianship assets to the Estate of Charles E. Mitchell" but denied the motion filed by First Financial Bank and Mitchell's heirs to "close the guardianship and transfer claims and bond."  Appellee's App. at 36.  And in November 2010 the guardianship case was transferred to Vigo Superior Court 3.  Thus, the Insureds are correct that the guardianship is still pending.  But that is not the end of our inquiry.  Rather, we must also review the three claims the Insureds submitted for coverage under each of the Policies.

---

[5]  For simplicity, in the remainder of this decision the term "policy period" shall include the sixty-day reporting period following the expiration of the policy.

## 2009 Policy

Again, the 2009 Policy was in effect from July 15, 2009, to July 15, 2010. The Insureds submitted to Evanston the three complaints, which Evanston acknowledged to be claims as defined under the Policies. They submitted the first claim on October 13, 2010 (Case GU-22); the second on October 21, 2010 (Case ES-3954); and the third on February 24, 2011 (Case PL-9720). But, again, the 2009 Policy provided coverage only for claims of which the Insureds gave notice during the policy period, which was July 15, 2009, through July, 15, 2010, with a sixty-day extended reporting period to September 13, 2010. Because the Insureds submitted the claims after the expiration of the 2009 Policy reporting period, and because the 2009 Policy requires claims to be made during the policy period or extended reporting period, none of the three claims that the Insureds submitted to Evanston were timely. Therefore, the trial court correctly determined as a matter of law that the Insureds were not entitled to coverage under the 2009 Policy for any of the three claims.

## 2010 Policy

We next consider whether there is a genuine issue of material fact regarding whether the Insureds' claims were submitted within the policy dates of the 2010 Policy. The 2010 Policy's dates were July 15, 2010, through July 15, 2011, with a retroactive effective date of July 15, 2009 and a sixty-day extended reporting period to September 13, 2011. Each of the three complaints tendered to Evanston for coverage includes allegations of misfeasance and malfeasance by the Insureds on particular dates alleged to have occurred prior to the effective date of the 2010 Policy. The Insureds have designated no evidence

20

to create a genuine issue of material fact in that regard. Thus, as a matter of law, the conduct alleged to have occurred on particular dates did not occur within the policy period and, therefore, is not subject to coverage under the 2010 Policy.

We next consider the generalized allegations of undated conduct. The Insureds contend that the complaints allege misfeasance or malfeasance that may have occurred before the effective date of the policy but continued to occur into and during the policy period, thereby bringing the conduct complained of within the 2010 Policy period. Again, the 2010 Policy covers Wrongful Acts, defined as "any negligent act, error or omission in Professional Services." Appellants' App. at 105, 129. In order to determine whether the Wrongful Acts alleged in the complaint fall within the 2010 Policy period, we must determine when the acts occurred. Thus, we consider the course of the guardianship and the generalized allegations involved.

The Insureds became Mitchell's temporary guardian in 2006 and his permanent guardian in 2007. As guardians, the Insureds had a fiduciary duty to protect, preserve, and manage Mitchell's property. See Ind. Code § 29-3-8-3. But Mitchell died in April 2008. And while the Insureds have shown that the guardianship remained open throughout the policy period, they did not designate any evidence to show what guardianship duties they performed or should have performed, if any, after July 15, 2009, more than one year after Mitchell's death.

Alternatively, we might compare the Insureds' performance to that of a hypothetical, reasonable guardian. Here, the complaints alleged, for example, that the Insureds grossly missed filing deadlines in the guardianship matter, allowed

21

embezzlement, made no attempt to recover embezzled funds or disputed expenses from the guardianship estate, and did not comply with the statutory requirements of a guardian.[6] A reasonable guardian would have performed such duties in a timely manner, promptly attempted to recover embezzled monies or disputed expenses from the guardianship estate, and complied with all statutory requirements for guardians. And in so doing a reasonable guardian would have performed the duties during the ward's lifetime and in the months after the ward's death or would designate evidence to show why circumstances prevented such performance.

Applying that logic, we reject the Insureds' continuing wrong theory. Again, the Insureds designated no evidence to create a genuine issue of material fact as to whether the alleged wrongs continued into the policy period. Thus, we conclude that the Insureds' duty to act as Mitchell's guardian existed primarily during his lifetime and for a reasonable period after his death in 2008. As such, the Wrongful Acts alleged in all three complaints occurred during that same period. In other words, we conclude that, for each undated allegation of misconduct in the complaints, the original Wrongful Act occurred when the Insureds performed deficiently or failed to perform in a timely fashion. That the Insureds never acted in some instances or, by their prior conduct, caused losses during the 2010 Policy period does not alter the fact that the Wrongful Act occurred before the policy period. Thus, as a matter of law, the undated generalized allegations of Wrongful Acts

---

[6] The trial court found, and it is undisputed, that Ditteon knew about the embezzlement in May 2008. Accordingly, the claims related to the embezzlement are also excluded from coverage as a matter of law under the express policy provision requiring that the insured have had no knowledge of a wrongful act which may have led a reasonable person to conclude that a claim was likely.

pertaining to the Insureds' guardianship of Mitchell as alleged in Case GU-22, Case ES-3954, and Case PL-9720 are not covered by that policy.

## Conclusion

The Insureds appealed the Summary Judgment Order declaring that Evanston has no duty to defend, provide coverage, or indemnify under the 2009 Policy or the 2010 Policy for claims alleged in the three complaints they submitted to Evanston. The designated evidence shows clearly and unambiguously that the Policies provide coverage only for the Insureds' conduct as Mitchell's court-appointed guardian. Thus, as a matter of law, the Policies provide no coverage for the allegations pertaining to the Insureds' conduct as the personal representative of Mitchell's estate.

We further conclude as a matter of law that the allegations in the three complaints pertaining to guardianship duties pertain to conduct that did not occur during the policy period of the Policies. The dated conduct in the complaints precedes the effective date of the policies, and the undated, generalized conduct pertains to acts the Insureds took or should have taken prior to the Policies' effective date. As such, the trial court did not err when it entered summary judgment in favor of Evanston, declaring that the Insureds are not entitled to a defense, coverage, or indemnity under the Policies for the three complaints against them arising from their performance as Mitchell's guardian.

Affirmed.

BAKER, J., and CRONE, J., concur.

23