# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**ALICE M. MORICAL**
Hoover Hull LLP
Indianapolis, Indiana

**JOHN S. LETCHINGER**
Edwards Wildman Palmer LLP
Chicago, Illinois

ATTORNEY FOR APPELLEE:

**G. JOHN CENTO**
Cento Lane, LLC
Indianapolis, Indiana



FILED
Kevin S. Smith
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CLAIRE'S BOUTIQUES, INC., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 32A01-1209-CC-438 |
| | ) | |
| BROWNSBURG STATION PARTNERS LLC, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

---

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Mark A. Smith, Judge
Cause No. 32D04-0907-CC-221

---

**November 4, 2013**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Brownsburg Station Partners, LLC ("Brownsburg Station") filed a complaint against Claire's Boutiques, Inc. ("Claire's") alleging that Claire's had breached its lease ("Lease") for commercial retail space in Brownsburg Station Shopping Center. The parties filed cross-motions for summary judgment and, after a hearing, the trial court issued its order, with findings of fact and conclusions thereon, granting Brownsburg Station's motion for summary judgment and denying the cross-motion filed by Claire's ("Summary Judgment Order"). Claire's filed a motion to reconsider, which the trial court granted, vacating the Summary Judgment Order ("Reconsideration Order"). Following a two-day bench trial, the court issued findings of fact and conclusions thereon and entered judgment in favor of Brownsburg Station but denied its request for consequential damages ("Judgment").

Claire's appeals the Reconsideration Order and the Judgment, and Brownsburg Station cross-appeals the Judgment denying consequential damages. We address two dispositive issues on appeal:

1. Whether the trial court erred when it construed the operating co-tenancy provision in the Lease to allow Claire's to terminate the Lease if the occupancy level fell below seventy percent of the gross leasable area rather than "70% of the non-department retail store tenants in Buildings A1 and A3."

2. If the trial court erred in its construction of the co-tenancy provision, whether the trial court also erred when it determined that Claire's had not terminated the Lease by vacating the premises before Brownsburg Station terminated the Lease by written notice.

We reverse and remand with instructions.[1]

## FACTS AND PROCEDURAL HISTORY

Brownsburg Station owns real estate commonly known as Brownsburg Station Shopping Center ("the Shopping Center") in Hendricks County. The Shopping Center is comprised in relevant part of two anchor retail spaces and two buildings, Buildings A1 and A3, each of which is divided into smaller retail spaces. At all relevant times, CB Richard Ellis ("CBRE") served as real estate manager of the Shopping Center.

In early 2007, Brownsburg Station negotiated a lease for retail space in the Shopping Center ("the Lease") with Claire's. After negotiations regarding the lease language, Claire's and Brownsburg Station entered into the Lease for 1500 square feet of space in Building A3 with a term from November 17, 2007, to January 2013. The Lease included the following operating co-tenancy provision:

> **Section 2.06  Operating Co-Tenancy.** Notwithstanding anything to the contrary contained in this Lease, in the event that the Shopping Center's occupancy level falls below 70% of the non-department retail store tenants in Buildings A1 and A3 or either Kohl's or Lowe's and [sic] open for business, [Claire's] shall pay percentage rent only (at the rate of 5% of gross sales) and Basic Annual Rent and all other charges to [Claire's] hereunder shall abate until such time as the occupancy level increases to over 70% of the non-department retail store tenants in Buildings A1 and A3 and at least Kohl's and Lowe's or any comparable replacement thereof in terms of size and quality is open for business. If the occupancy level remains below the level specified herein for the period of one year or more, [Claire's] shall have the option of terminating this Lease effective immediately.

Appellant's App. at 134.

---

[1] We heard oral argument on August 27, 2013.

On May 15, 2009, Claire's decided to leave the premises in the Shopping Center because of that store's underperformance. On June 14, 2009, Claire's removed its personal property and vacated the leased space at the Shopping Center without notice to CBRE or Brownsburg Station. The following day, Brownsburg Station began trying to re-lease the retail space formerly occupied by Claire's. And on June 26, Brownsburg Station sent a notice of default to Claire's, terminating the Lease and the Lease term and demanding payment of the accelerated balance ("termination notice"). Claire's did not respond and made no further rent payments.

On July 17, 2009, Brownsburg Station filed a complaint for breach of lease against Claire's.[2] On August 31, Claire's filed its answer, affirmative defenses, and request for jury trial. In its answer, Claire's asserted in part that it had terminated the lease as a result of Brownsburg Station's "failure to exceed 70% occupancy of non-department retail store tenants for more than one year." Appellant's Supp. App. at 222. On December 27, 2010, Brownsburg Station filed its motion for partial summary judgment, supporting brief, and designation of evidence. On January 31, 2011, Claire's filed its cross-motion for summary judgment, opposition to Brownsburg Station's partial summary judgment motion, supporting memoranda, and designation of evidence or, in the alternative, its motion for partial summary judgment. On February 28, Brownsburg Station filed its brief in opposition to Claire's cross-motion for summary judgment and to its alternative motion for partial summary judgment and designation of evidence in support of its brief in opposition.

---

[2] The parties have not included a copy of the complaint in the record on appeal.

And on April 27, Brownsburg Station filed its sur-reply brief in support of its motion for partial summary judgment and in opposition to Claire's cross-motion for summary judgment and to its alternative motion for partial summary judgment.

The trial court held a hearing on the motions for summary judgment on May 11. On June 6, the court granted partial summary judgment in favor of Brownsburg Station as to liability. On August 16, Claire's filed a motion for reconsideration, and on December 12, the trial court entered the Reconsideration Order, granted Claire's' motion for reconsideration, found the lease provision in dispute to be ambiguous, denied both motions for summary judgment, and set all issues for trial.

A bench trial was held on April 23-25 and June 14-15, 2012, and the parties submitted proposed findings and conclusions. And on August 30, 2012, the trial court issued its "Findings of Fact, Conclusions of Law and Judgment" in favor of Brownsburg Station on all issues except its request for consequential damages. Appellant's Brief Addendum at 9. The trial court held that, under the operating co-tenancy provision, the occupancy level should be calculated based on the percentage of gross leasable area, that Claire's had breached the Lease, and that Claire's did not have an option to terminate the Lease. Claire's now appeals the Reconsideration Order and the Judgment, and Brownsburg Station cross-appeals the Judgment denying its claim for consequential damages.

## DISCUSSION AND DECISION

### Standard of Review

The issues on appeal turn on the meaning of a provision in a commercial lease, a contract. "Construction of the terms of a written contract is a pure question of law for the

court, reviewed de novo." Harrison v. Thomas, 761 N.E.2d 816, 818 (Ind. 2002). If an instrument's language is unambiguous, the parties' intent is determined from the four corners of the instrument. City of Indianapolis v. Kahlo, 938 N.E.2d 734, 744 (Ind. Ct. App. 2010), trans. denied. If a contract is ambiguous or uncertain, its meaning is determined by extrinsic evidence and its construction is a matter for the fact-finder. Kahlo, 938 N.E.2d at 744. An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. Gregg, 812 N.E.2d at 215. But the fact that the parties disagree over the meaning of the contract does not, in and of itself, establish an ambiguity. Everett Cash Mut. Ins. Co. v. Taylor, 926 N.E.2d 1008, 1013 (Ind. 2010) (citation omitted).

When interpreting a written contract, the court should attempt to determine the parties' intent at the time the contract was made, which is ascertained by the language used to express their rights and duties. Kahlo, 938 N.E.2d at 744. A court should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. Hammerstone v. Ind. Ins. Co., 986 N.E.2d 841, 846 (Ind. Ct. App. 2013).

Here, Claire's appeals the Reconsideration Order denying Claire's motion for summary judgment. As discussed below, we conclude that this case should have been resolved at the summary judgment stage. A motion for summary judgment is properly granted only when the pleadings and designated evidence reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Hair v. Schellenberger, 966 N.E.2d 693, 697 (Ind. Ct. App. 2012) (citations omitted), trans.

denied. Where, as here, the dispute is one of law rather than fact, our standard of review is de novo. Villegas v. Silverman, 832 N.E.2d 598, 604 (Ind. Ct. App. 2005).

**Issue One:  Operating Co-Tenancy Provision**

Claire's first contends that the trial court erred when it construed the operating co-tenancy provision in the Lease. Again, the relevant portion of the Lease provides:

> **Section 2.06  Operating Co-Tenancy.** Notwithstanding anything to the contrary contained in this Lease, in the event that the Shopping Center's occupancy level falls below 70% of the non-department retail store tenants in Buildings A1 and A3 or either Kohl's or Lowe's and [sic] open for business, [Claire's] shall pay percentage rent only (at the rate of 5% of gross sales) and Basic Annual Rent and all other charges to [Claire's] hereunder shall abate until such time as the occupancy level increases to over 70% of the non-department retail store tenants in Buildings A1 and A3 and at least Kohl's and Lowe's or any comparable replacement thereof in terms of size and quality is open for business. If the occupancy level remains below the level specified herein for the period of one year or more, [Claire's] shall have the option of terminating this Lease effective immediately.

Appellant's App. at 134 (emphases added). In the Reconsideration Order, the trial court found that language to be ambiguous and ordered a trial. And following trial, the court adopted the construction of this provision argued by Brownsburg Station and determined that the provision gave Claire's the option to terminate the Lease only in the event the occupancy level fell below seventy percent of the gross leasable area in Buildings A1 and A3.

In its challenge to the Reconsideration Order, Claire's contends that the trial court erred when it determined that the operating co-tenancy provision was ambiguous regarding the method for calculating the occupancy level under that provision. Claire's contends that the Lease unambiguously allowed Claire's to terminate the Lease in the event the

7

occupancy level fell below seventy percent of the total possible tenants, not seventy percent of the gross leasable area in Buildings A1 and A3. Brownsburg Station counters that the operating co-tenancy provision unambiguously supports its construction and, therefore, that the trial court erred when it entered the Reconsideration Order but correctly entered Judgment in favor of Brownsburg Station after trial. Thus, we must determine the meaning of the operating co-tenancy provision in the Lease.

Claire's and Brownsburg Station are sophisticated parties experienced in negotiating commercial leases. As noted above, the ultimate question is the intent of the parties at the time the lease was executed as disclosed by its terms. While there are numerous rules of contract construction, the first rule to be applied is the plain meaning rule. When the terms of a contract are drafted in clear and unambiguous language, we will apply the plain and ordinary meaning of that language and enforce the contract according to those terms. Haegert v. Univ. of Evansville, 977 N.E.2d 924, 937 (Ind. 2012). The text is the lodestar of a written contract, and we will not construe unambiguous provisions. See Winterton, LLC v. Winterton Investors, LLC, 900 N.E.2d 754, 759 (Ind. Ct. App. 2009), trans. denied. Nor may a court write a new contract for the parties or supply missing terms under the guise of construing a contract. State Military Dep't v. Cont'l Elec., Co., 971 N.E.2d 133, 142 (Ind. Ct. App. 2012) (quotation marks and citation omitted), trans. denied. Where the subjective intent of the parties is at odds, the text controls. If necessary, the text of a disputed provision may be understood by reference to other provisions within the four corners of the document. See City of Portage v. S. Haven Sewer Works, Inc. (In re S. Haven Sewer Works, Inc.), 880 N.E.2d 706, 711 (Ind. Ct. App. 2008). But when the

8

meaning of the text is clear, recourse to other provisions of the contract is unnecessary, and we may not forage through the contract looking for other provisions. It is well settled that when the terms of a contract are clear and unambiguous, they are conclusive, and courts will not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions.[3] Dvorak v. Christ, 692 N.E.2d 920, 925 (Ind. Ct. App. 1998).

Such is the case here. The operating co-tenancy provision makes no mention of gross leasable area or square footage. Instead, the plain language of that provision refers to "70% of the non-department retail store tenants in Buildings A1 and A3[.]" Appellant's App. at 134 (emphasis added). Because the language in the operating co-tenancy provision is clear, we need not resort to other parts of the Lease or to extrinsic evidence to understand that provision. The seventy percent rate clearly applies to the percentage of tenants, not to the percentage of gross leasable area.

At the summary judgment hearing each party argued that the Lease was unambiguous in its favor. On appeal, in countering Claire's' interpretation of the Lease, Brownsburg Station contends that if the meaning of the co-tenancy provision in Section 2.06 is deemed ambiguous that provision should be understood by reference to other provisions of the Lease. Specifically, Brownsburg Station contends that even though there

---

[3] In its appellate brief and at oral argument, Brownsburg Station argued in favor of referring to extrinsic evidence in order to determine whether the operating co-tenancy provision in the Lease is ambiguous. In support, Brownsburg Station cites cases from other jurisdictions. But we are not bound by the law in other jurisdictions. See Lyons v. McDonald, 501 N.E.2d 1079, 1081 (Ind. Ct. App. 1986). Instead, we are bound by the law of this jurisdiction, which provides that extrinsic evidence may be used to construe a contract only if the court determines that the contract is ambiguous. See Kahlo, 938 N.E.2d at 744. As discussed below, we conclude that the operating co-tenancy provision is unambiguous. Therefore, we do not consider extrinsic evidence.

is no mention of leasable area or square footage in the co-tenancy provision, the term "occupancy" used in the co-tenancy provision refers to square feet of occupied space. Brownsburg Station insists that the co-tenancy provision "does not define the methodology for calculation of the occupancy level." Appellee's Brief at 32. In other words, Brownsburg Station contends that the phrase "occupancy level . . . below 70% of the non-department retail store tenants in Buildings A1 and A3" is incomplete and requires reference to other Lease provisions to be understood. We cannot agree. Here, there are no missing essential terms. The methodology for calculation of the occupancy level is clearly and unambiguously defined in the operating co-tenancy provision as "70% of the non-department retail store tenants" in those buildings. Appellant's App. at 134.

Brownsburg Station further contends that the term at issue is "occupancy level," not "tenants," and, thus, that the "relevant part of Section 2.06" is the second sentence, which states: "If the occupancy level remains below the level specified herein for a period of one year or more, [Claire's] shall have the option of terminating this Lease effective immediately." Appellee's Brief at 28-29. Brownsburg Station maintains that Claire's' defense to liability "rests entirely" on the second sentence of Section 2.06. Id. at 28. Brownsburg Station continues that Claire's relies on an interpretation of the word "tenants" and that because the word "tenants" does not appear within the second, all-important sentence, Claire's' interpretation of the operating co-tenancy provision relies on the

"wrong term." Id. at 28. This argument is not persuasive.[4] It is not only incorrect to say that Claire's "rests entirely" on the second sentence, but Brownsburg Station isolates and reads the second sentence to the exclusion of the first sentence in Section 2.06. The two sentences are related. When the second sentence refers to "the [occupancy] level specified herein," the second sentence refers directly to the occupancy level specified in the first sentence in Section 2.06 as the percentage of "non-department store retail tenants in Buildings A1 and A3." Appellant's App. at 134.

Brownsburg Station also contends that "the lease interpretation offered by Claire's is not a reasonable one."[5] Appellee's Brief at 21. And at oral argument, counsel for Brownsburg Station asserted that its interpretation is the only reasonable interpretation of the Lease. We cannot agree. Not only does the plain and ordinary meaning of Section 2.06 support Claire's interpretation, but there is also a sound rationale for measuring the occupancy level by the number of tenants. A greater number and variety of tenants is more likely to attract more customers, increase foot traffic, and generate larger sales.

Brownsburg Station further contends that Claire's' interpretation of the operating co-tenancy provision "is inconsistent with the parties' intent [and] the other provisions of the Lease." Id. at 22. In particular, Brownsburg Station contends that "[e]verywhere space is discussed or identified it is discussed and identified in terms of square footage." Id. at

---

[4] Brownsburg Station also makes an intricate grammatical argument, which is no match for the plain and ordinary meaning of the text and could not have been contemplated by the parties at the time the Lease was made.

[5] While our opinion does not consider or rest upon the trial court's findings and conclusions, we note the trial court's finding that "[c]alculating occupancy level in operating co-tenancy provisions based on number of tenants as opposed to gross leasable area . . . is an industry-recognized practice." Appellant's App. at 22.

11

23. But that argument conflates and equates space with occupancy. While space and occupancy are closely related terms, they are not one and the same term. The best evidence of the parties' intent is the plain meaning of the words they use. Square footage defines space elsewhere in the Lease, but the words "square footage" and "space" do not appear in the operating co-tenancy provision. In that provision, the operative term is not square footage or space but "occupancy level," which is clearly defined as the percentage of "non-department retail store tenants in Buildings A1 and A3." Appellant's App. at 134.

Here, the rule of contract construction that specific terms control over general terms also squarely applies. Where the parties have agreed to a specific term, an apparently inconsistent general statement must yield to a more specific term. Arnold v. Burton, 651 N.E.2d 1202, 1204 (Ind. Ct. App. 1996). While the Lease may at times generally discuss or identify space in terms of square footage, in the operating co-tenancy provision the Lease specifically defines the occupancy level as a percentage of tenants.

It is also significant, if not dispositive, that Section 2.06 begins with the following introductory clause: "Notwithstanding anything to the contrary contained in this Lease . . . ." Appellant's App. at 134. This clause qualifies the operating co-tenancy provision and means that, in spite of any other lease provision, Section 2.06 controls calculation of the occupancy level. In other words, Section 2.06 is an independent provision that sits on its own bottom. This clause subordinates any lease provision that may conflict with it and categorically renders any such contrary provision ineffective. This clause is essential to a correct understanding of the operating co-tenancy provision.

12

We decline Brownsburg Station's invitation to construe and rewrite an unambiguous provision and to substitute the words "70% of gross leasable area" for the actual words, "70% of non-department retail store tenants." We conclude that the method for calculating the occupancy level is apparent on the face of the operating co-tenancy provision in Section 2.06 and is defined by the percentage of the "non-department retail store tenants in Buildings A1 and A3." Section 2.06 simply does not say "70% of gross leasable area in Buildings A1 and A3" or "70% of the square footage contained in Buildings A1 and A3." The occupancy level is defined as the percentage of tenants.

By its plain language, the operating co-tenancy provision allowed Claire's to terminate the Lease in the event the occupancy level fell below seventy percent of the non-department retail store tenants in Buildings A1 and A3, not seventy percent of the gross leasable area or square footage contained in those buildings, for a period of one year or more. The clause "[n]otwithstanding anything to the contrary contained in this Lease" in Section 2.06 precludes consideration of other provisions that might appear to conflict with it. In reaching that conclusion, again, we have considered only the evidence designated for summary judgment. And "[s]ummary judgment is especially appropriate in the context of contract interpretation because the construction of a written contract is a question of law." Vincennes Univ. by the Bd. of Trs. of Vincennes v. Sparks, 988 N.E.2d 1160, 1165 (Ind. Ct. App. 2009), trans. denied. Thus, the trial court erred as a matter of law when it concluded that the occupancy level in the operating co-tenancy provision is based on gross leasable area in Buildings A1 and A3, and, on that basis, denied summary judgment in favor of Claire's.

## Issue Two: Termination of the Lease

Claire's also contends that its departure from the leased premises constituted termination permitted under the Lease pursuant to the operating co-tenancy provision and, therefore, it is not liable to Brownsburg Station for any damages. Here the parties do not dispute the relevant underlying facts, namely, that Claire's vacated the leased premises without notice before the end of the Lease term and that the occupancy level was below seventy percent of tenants for at least one year. The issue then is a question of law, namely, whether Claire's' conduct in vacating the leased premises satisfies the definition of termination under the operating co-tenancy provision.

Again, the operating co-tenancy provision states, in relevant part: "If the occupancy level remains below the level specified herein for the period of one year or more, [Claire's] shall have the option of terminating this Lease effective immediately." Appellant's App. at 134. But the Lease does not define "termination," nor does it require notice or impose any other conditions or requirements for termination by Claire's pursuant to the operating co-tenancy provision. Brownsburg Station's argument that Claire's did not exercise its option to terminate the Lease is not well taken.

Nevertheless, Brownsburg Station contends that Claire's had only an option to terminate the Lease and did not timely exercise that option. Specifically, Brownsburg Station argues that Claire's did not terminate the Lease when it vacated the premises but, rather, breached the Lease when it abandoned the premises. Brownsburg Station argues further that it terminated the Lease when it sent a termination notice to Claire's and that Claire's' option to terminate did not survive Brownsburg Station's notice of termination.

14

Brownsburg Station is correct that an option in a lease does not survive termination of the lease unless the option is divisible from the lease. Tippmann Refrigeration Constr. v. Erie-Haven, Inc., 459 N.E.2d 407, 411 (Ind. Ct. App. 1984). But the dispositive question is whether Claire's terminated the lease when it vacated the premises. Again, the Lease does not define "termination." Under these circumstances, we conclude that Claire's exercised its option to terminate the Lease when it vacated the premises pursuant to the operating co-tenancy provision and that the Lease does not require any other notice or action by Claire's.

Finally, Brownsburg Station contends that Claire's cannot raise the operating co-tenancy provision as a defense to liability under the Lease after the fact because the occupancy level was not the reason that Claire's closed its store and vacated the premises. In other words, Brownsburg Station argues that Claire's "fabricate[d] its method to calculate occupancy" after it had vacated the premises. Appellee's Brief at 17. In response, Claire's points to College Point Boat Corp. v. United States, 267 U.S. 12 (1925). There, the United States Supreme Court held:

> A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later. An unconditional right to cancel can be availed of for the purpose of terminating a contract, even after suit brought, unless some intervening change in the position of the other party renders that course inequitable.

Id. at 15-16. Although no prior Indiana case has applied College Point Boat Corp., the Court's reasoning is on point here. Thus, Claire's was entitled to assert the terms of the

operating co-tenancy provision as a defense to Brownsburg Station's complaint, even though Claire's was apparently not aware of that defense at the time it vacated the premises.

**Conclusion**

We hold as a matter of law that the operating co-tenancy provision in the Lease unambiguously states that Claire's could terminate the Lease in the event the occupancy level fell below seventy percent of the non-department retail store tenants in Buildings A1 and A3, not seventy percent of the gross leasable area in those buildings, for a period of one year or more. Brownsburg Station's construction of Section 2.06 would render the introductory clause ineffective and meaningless, disregard the plain and ordinary meaning of the actual text, and insert terms that are not there, all of which violate the rules of contract construction. In sum, Brownsburg Station would have us write a new operating co-tenancy provision for the parties, which we will not do.

We also hold that Claire's properly terminated the Lease. The parties do not dispute that the occupancy level of Buildings A1 and A3, defined by the number of tenants, had fallen below seventy percent for one year when Claire's vacated the leased premises. And the Lease does not require notice or that any other action be taken in order for Claire's to terminate its tenancy under that provision. As such, we conclude that Claire's exercised its option under the operating co-tenancy provision to terminate the Lease when it vacated the premises. Therefore, the trial court erred as a matter of law when it denied Claire's'

motion for summary judgment as to liability under the lease. We vacate the Judgment and remand for the trial court to enter summary judgment in favor of Claire's.[6]

Reversed and remanded with instructions.

BAILEY, J., and BARNES, J., concur.

---

[6] Because we conclude that the trial court should have granted summary judgment as to liability in favor of Claire's, we need not address Brownsburg Station's claim on cross-appeal that the trial court erred when it declined to award consequential damages.