

# IN THE
# Court of Appeals of Indiana



FILED

Jul 10 2025, 8:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Holcim (US) Inc.,

*Appellant / Defendant*

v.

ACMS Group, Inc.,

*Appellee / Plaintiff*

July 10, 2025

Court of Appeals Case No.
24A-PL-2458

Appeal from the Lake Superior Court

The Honorable John M. Sedia, Judge

Trial Court Cause No.
45D01-2202-PL-163

**Opinion by Judge Bradford**
Judges May and Mathias concur.

**Bradford, Judge.**

## Case Summary

[1] ACMS Group, Inc., contracted to rebuild a manufacturing apparatus called a slag granulator for Holcim (US) Inc., in East Chicago ("the Project"). The slag granulator is located in a steel mill ("the Mill") owned by Cleveland-Cliffs. As part of the contract between ACMS and Holcim ("the Agreement"), Holcim agreed to clean the jobsite so that ACMS could perform its work. When ACMS arrived on the start date, however, the cleaning had not been completed, causing costly delays. When ACMS billed Holcim for expenses related to the delay, Holcim declined to pay. ACMS brought suit against Holcim, alleging, among other things, breach of the Agreement, seeking direct and consequential damages. After a bench trial, the trial court concluded that Holcim had breached the Agreement and awarded ACMS direct and consequential damages, prejudgment interest, and attorney's fees totaling almost six million dollars. Holcim contends that the trial court clearly erred in finding that it had breached the Agreement and, in the alternative, challenges several aspects of the trial court's findings regarding direct and consequential damages. We affirm.

## Facts and Procedural History

[2] In August of 1902, the Mill was constructed in East Chicago for the purpose of steel production. The production of steel involves heating raw iron ore to high temperatures in a blast furnace, generating a byproduct called slag. In 2001, a company that is now part of Holcim negotiated with the former owner of the Mill to process the slag produced by blast furnace number seven ("No. 7") with

a machine called a slag granulator for use in cement production. Holcim currently leases part of the Mill from Cleveland-Cliffs and operates the slag granulator to that end.

[3] From time to time, it is necessary to rebuild the slag granulator and associated machinery, and Holcim planned such a reconstruction to occur in September of 2021 to coincide with a scheduled shutdown of No. 7. Holcim awarded the reconstruction project to ACMS, and the Agreement was executed on August 5, 2021. The Agreement provides, in relevant part, as follows:

> Services, as such term is used in the Agreement, shall mean the following:
>
> This project shall consist of the construction services associated with the demolishing and replacement of the receiving hopper and two (2) granulation basins and associated work at the slag granulator. Additional work at the blowing boxes, cold runners, dewatering area, structural and piping is also included. Services necessary to complete this task order includes providing all licenses, permits, labor, materials, equipment supervision and management to complete the project. Area specific details are included on the drawings. Accuracy of these drawings needs to be confirmed, and [Holcim] is not responsible for the accuracy of any drawings provided. All material supplied by [Holcim] must be onsite prior to the scheduled installation date on the provided schedule.
> [….]
> 4. Any required material for refractory and structural repairs above and beyond the budget will be billed as T&M. Any and all surplus money for Cold Runner repair material will be discounted upon discovery.
> 5. *Cleaning will be performed by* [Holcim] *prior to the beginning of the work, including but not limited to the Hopper Tank Basement, Receiving Hopper surrounding, Granulator surrounding, and cold*

> *runners.* [ACMS] *has excluded cleaning, and all cleaning will be performed by* [Holcim] *at* [ACMS]*'s direction.*

Appellant's App. Vol. II pp. 125–26 (emphasis added). For convenience, we will refer to the emphasized language as "Paragraph 5."

[4] When ACMS arrived as scheduled at the Mill to begin rebuilding the slag granulator, it found that it could not begin work because Holcim had done little cleaning to the relevant areas, which caused delay and additional expense to ACMS. Working with Holcim, ACMS managed to complete the rebuilding process, but not within the thirty-five days originally contemplated. ACMS billed its additional expenses to Holcim as "T&M," *i.e.*, "time and materials," which Holcim declined to pay. Findings of Fact p. 4. As of December 9, 2021, Holcim had paid ACMS $3,049,000.00 pursuant to the Agreement, leaving a contract balance of $649,000.00 plus T&M amounts ACMS had billed for additional work. In February of 2022, ACMS executed and recorded a mechanic's lien notice for the amounts that allegedly remained unpaid, plus interest and attorney's fees.

[5] On February 22, 2022, ACMS brought suit against Holcim, seeking foreclosure of its mechanic's lien, damages for breach of the Agreement, and recovery under a theory of quantum meruit. On April 22, 2022, Holcim responded and counterclaimed, alleging that ACMS had breached the Agreement. On February 3, 2023, ACMS moved to add a fourth count, seeking consequential damages resulting from its failure to timely pay various taxes and union benefits.

[6]     On December 29, 2023, both parties moved for summary judgment, and, on February 23, 2024, the trial court granted ACMS's motion in part, ruling that its mechanic's lien had been perfected. The trial court also entered summary judgment in favor of Holcim on ACMS's quantum meruit claim. On April 5 and 8, 2024, the parties and judge held a judicial settlement conference, which resulted in several claims being settled and Holcim's counterclaim being dismissed with prejudice.

[7]     The remaining issues were tried to the bench between April 9 and 16, 2024. Among other things, ACMS offered into evidence its trial exhibit one, an itemized list of alleged direct damages attributable to Holcim's failure to clean:

| EWO | Extra Work Orders | Hours | labor$ | Equipment$ | Subcontract $ | materials$ | [10%] Markup (F+G+H) | Final Price |
|---|---|---|---|---|---|---|---|---|
| ex01 | Refractory Materials over bid amount | 420 | $39,860.84 | $30,600.00 | | $158,831.00 | $18,943.10 | $248,234.94 |
| ex02 | Crane: Additional Stack weight/ Lafarge Deliveries/ Cleaning efforts | | | | $508,480.19 | | $50,848.02 | $559,328.21 |
| ex03 | Additional Scope: Cladding for Cold Runner | 360.25 | $39,401.56 | | | $20,424.60 | $2,042.46 | $61,868.62 |
| ex04 | Cleaning Delays | 1462 | $146,981.85 | | | | | $146,981.82 |
| EX05 | receiving hopper additional assembly & Internals | 1075 | $123,149.75 | $3,972.46 | $40,325.00 | $2,899.25 | $4,719.67 | $175,066.13 |
| EX06 | stack Internal seal welds scaffolding | 94.5 | $9,259.09 | | $15,666.21 | $1,177.00 | $1,684.32 | $27,786.62 |
| EX07 | Stack Belly Band due to misfabrication of spool piece | 144 | $14,322.65 | $1,274.48 | $47,362.00 | $6,848.00 | $5,548.45 | $75,355.58 |
| EX08 | load and transport scrap pieces from Jobsite to laydown | | | | $48,234.72 | | $4,823.47 | $53,058.19 |
| EX09 | East Basin Insert Misfabrication | 287.5 | $29,051.15 | | | $6,929.32 | $692.93 | $36,673.40 |
| EX10 | ACMS Labor Support for cleaning efforts | 1096.1 | $121,504.17 | $24,612.99 | | | $2,461.30 | $148,578.46 |
| EX11 | Compression of Schedule - Modularization of Rec Hopper Install | | | $41,382.68 | $80,232.50 | $38,413.00 | $16,002.82 | $176,031.00 |
| EX12 | Additional water line demo | 47.5 | $5,724.42 | | | | - | $5,724.42 |

| ID | Description | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EX13 | Additional Rigging for over-weight Rec Hopper | 60 | $6,930.37 | $30,355.88 | $15,973.73 | | $4,632.96 | $57,892.94 |
| EX14 | Additional Overtime and Additional Labor to accelerate schedule because of lack of cleaning | 6177.3 | $758,169.64 | $10,436.07 | | | $1,043.61 | $769,649.32 |
| EX15 | Rec Hopper Demo due to over weight/ additional anchoring | 564.4 | $64,565.13 | $13,560.27 | $15,973.73 | $10,201.38 | $3,973.54 | $108,274.05 |
| EX16 | Expansion Joint Added Scope | 282 | $19,563.78 | $3,972.46 | $18,382.00 | | $2,235.45 | $44,153.69 |
| EX17 | Scaffolding Additional / Rework Due to lack of cleaning | | | | $56,398.36 | | $5,639.84 | $62,038.20 |
| EX18 | Faulk PLI - Pipe Elevation Check | | | | $10,924.25 | | $1,092.43 | $12,016.68 |
| EX19 | 7 BF Goggle Valve - Standby Delays | 1017.5 | $130,153.07 | | $44,101.77 | | $4,410.18 | $178,655.02 |
| EX20 | Extended Overhead caused by lack of Cleaning (30 day schedule) | 876 | $88,104.86 | $34,520.75 | | $5,256.00 | $3,977.68 | $131,859.29 |
| EX21 | Pipe for 30" fabrications per Ian Gotee | 49.5 | $7,067.93 | | | $1,637.10 | $163.71 | $8,868.74 |
| EX22 | Extended Time for Barnhart | | | | $68,368.52 | | $6,836.85 | $75,205.37 |
| EX23 | Overhead Claim Preparations | 1200 | $124,881.39 | | | | | $124,881.39 |
| | SUBTOTAL: | | | | | | | $3,288,192.09 |

Ex. Vol. 11 pp. 133–34.[1]  ACMS also produced evidence of consequential damages, in the form of penalties for late payment of union benefits and employment taxes of approximately $930,000.00.

[8]     On July 8, 2024, the trial court entered judgment in favor of ACMS for $4,339,165.89 plus prejudgment interest from October 28, 2021.  The trial court's order provided, in part, as follows:

> There is no question that Holcim did not have the granulator and surrounding area cleaned prior to the start of the project and that ACMS, through walk-throughs and the provision

---

[1] The items listed in this exhibit designated "ex01" through "EX23" are variously referred to by the parties as "Extra Work Items," "Extras," or "Line Items."  We shall refer to them as "Extra Work Items."

of its work schedule even before the execution of the contract which showed which areas needed to be cleaned did direct Holcim as to the cleaning that needed to be done.

All the issues raised by Holcim regarding the complex issues of cleaning the site at the same time as the reconstruction and all the shortcomings of ACMS during the project that would relieve them from paying ACMS's claims, including the lack of a consistent General Superintendent, lack of communication and coordination regarding the disposal of scrap Holcim failed to remove from the granulator area, the construction and placement of cranes, the additional labor and the idling of labor due to potentially dangerous situations; all would have never happened if Holcim had the granulator area cleaned and ready prior to ACMS beginning its work as required by the Services Agreement.

Holcim does raise the issue of the impossibility of fulfilling its obligation to clean between the time No. 7 was shut down and the starting date of the project because no (or very little) cleaning could take place while the furnace was in operation. If this were the case, certainly all of the people involved in this project, including those who provided the invitation to bid and negotiated the Services Agreement, all of whom were well-experienced in the steel-making industry and many of whom testified at trial, would have known and adjusted [Paragraph 5] to so reflect.

Contracts have to mean something. Holcim was well-experienced in slag granulation and the operations of the steel industry. Holcim was certainly aware that no one could be in the vicinity of a slag granulator facility when a blast furnace was in operation. Holcim executed the Services Agreement, binding itself to [Paragraph 5]. It may have been an oversight, a bad decision, or a signature made looking over its shoulder at Cliffs, but it was done with eyes wide open, with no misrepresentation by ACMS and with a full knowledge of what it had to do.

Conversely, ACMS agreed that Holcim would not be held responsible in Exhibit A paragraph 3 for the accuracy of any drawings. ACMS relied on the drawings provided by Paul Wurth, the engineering firm hired for the project, that the receiving hopper would be fully assembled when it actually arrived unassembled,

> requiring ACMS to provide additional labor to assemble it. In addition, drawings of the Stack Scaffolding failed to show the necessity of a seal weld, which required additional work to accomplish the seal weld by ACMS. Claims against Holcim for this labor are precluded by Exhibit A paragraph 3.
>
> The remainder of the extra work that had to be accomplished by ACMS to fulfill its obligation under the Services Agreement was a direct result of Holcim's breach of [Paragraph 5] of that agreement.

Findings of Fact pp. 6–7. On September 12, 2024, the trial court denied Holcim's motion to correct error and awarded ACMS attorney's fees and costs of $609,374.00, bringing the total award to $5,937,361.00.

## Discussion and Decision

Where, as here, the trial court enters special findings and conclusions *sua sponte*, its judgment is to be reviewed on appeal as a general judgment with respect to any issue on which the trial court has not made a finding, and we will affirm the general judgment upon any legal theory supported by the evidence. *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993). The special findings of the trial court control only as to those issues which they cover and will not be set aside unless they are clearly erroneous. *Id*. In determining whether a judgment is clearly erroneous, the review requires a two-step analysis that considers both the findings of fact and conclusions of law. *Id*. A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon, and findings of fact are clearly erroneous only when the record is without facts or reasonable inferences to support them. *Id*.

In reviewing the findings and the judgment therefrom, we will neither reweigh the evidence nor judge the credibility of witnesses. *Parke State Bank v. Akers*, 659 N.E.2d 1031, 1033 (Ind. 1995). We defer to the trial court's proximity to the issues and observe that "those seeking to reverse the trial court's judgment labor under the formidable task of demonstrating that the trial court's findings are clearly erroneous." *In re Estate of Herin v. Herin*, 40 N.E.3d 495, 497 (Ind. Ct. App. 2015). "[U]ncontradicted evidence will sometimes support conflicting inferences, and when this is the case, the inferences drawn by the trier of the facts will prevail." *A.S.C. Corp. v. First Nat. Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960).

## I.    Breach of Contract

The basis for the trial court's judgment was its conclusion that Holcim had breached Paragraph 5 of the Agreement by having failed to have the jobsite properly cleaned in preparation for ACMS's work to begin. "The construction of the terms of a written contract is a pure question of law so our standard is de novo." *S.C. Nestel, Inc. v. Future Constr., Inc.*, 836 N.E.2d 445, 449 (Ind. Ct. App. 2005). "When interpreting a contract, a court must determine and give effect to the parties' intent through the language they use to express their rights and duties under the contract." *Gold v. Cedarview Mgmt. Corp.*, 950 N.E. 2d 739, 742 (Ind. Ct. App. 2011).

> Where terms of a contract are clear and unambiguous, we will apply the plain and ordinary meaning of the terms and enforce the contract according to its terms. *Claire's Boutiques, Inc. v. Brownsburg Station Partners LLC,* 997 N.E.2d 1093, 1098 (Ind. Ct. App. 2013).

> If necessary, the text of a disputed provision may be understood by referring to other provisions within the four corners of the document. *Id.* The four corners rule states that where the language of a contract is unambiguous, the parties' intent is to be determined by reviewing the language contained within the "four corners" of the contract, and "parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence." *Adams v. Reinaker,* 808 N.E.2d 192, 196 (Ind. Ct. App. 2004). Extrinsic evidence cannot be used to create an ambiguity. *Id.*

*John M. Abbott, LLC v. Lake City Bank*, 14 N.E.3d 53, 56 (Ind. Ct. App. 2014).

"[A]n ambiguity exists where the provision [in question] is susceptible to more than one reasonable interpretation." *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997).

[12] At issue is the following provision of the Agreement:

> Cleaning will be performed by [Holcim] prior to the beginning of the work, including but not limited to the Hopper Tank Basement, Receiving Hopper surrounding, Granulator surrounding, and cold runners. [ACMS] has excluded cleaning, and all cleaning will be performed by the [Holcim] at [ACMS]'s direction.

Appellant's App. Vol. II p. 126. Holcim contends that the cleaning provisions of the Agreement are ambiguous in several respects, namely that they do not state that the cleaning will be completed, the extent of the cleaning to be performed, or that Holcim was obligated to complete the cleaning before the reconstruction project's overall start date or before the Mill's outage. We find Holcim's contentions to be unpersuasive.

[13]     Holcim's suggestion that the Agreement did not obligate it to complete the cleaning process of the worksite is untenable. Although "clean" is not defined in the Agreement, it may be defined as "to make clean or free of dirt or any foreign or offensive matter: as […] to free of dirt, refuse, or litter and set in order[.]" WEBSTER'S 3D NEW INT'L DICTIONARY 418 (Phillip Babcock Gove et al. eds., G.&C. Merriam Company 1993). Keeping in mind that one contract provision may be understood by referring to other provisions of the contract, *see John M. Abbott, LLC*, 14 N.E.3d at 56, the only reasonable interpretation of the cleaning provision is that Holcim's obligation was to clean the worksite to the extent that it allowed ACMS to begin the reconstruction of the slag granulator, which was, after all, the whole point of Agreement. *See, e.g.*, *Guzorek*, 690 N.E.2d at 667 (noting that a contractual ambiguity exists only when there is more than one reasonable interpretation of the provision in question).

[14]     As far as the extent of the cleaning goes, while it is true that this was not explicitly detailed in the Agreement, it was to be performed at ACMS's direction, which is not ambiguous. ACMS general superintendent Timothy Shane Walleske testified that Holcim had been given directions regarding precisely which areas of the site needed to be cleaned during walkthroughs and through review of ACMS's schedule and that ACMS had answered any and all of Holcim's questions regarding cleaning. While the parties may have different views about whether ACMS's direction was adequate, that was a factual dispute (resolved in ACMS's favor by the trial court) that does not render the Agreement ambiguous.

Finally, Holcim contends that the Agreement was ambiguous regarding whether its cleaning was to be completed before ACMS was scheduled to begin reconstruction. As with other claims, this is not tenable in the context of the rest of the Agreement. The Agreement provides that "[c]leaning will be performed by [Holcim] *prior to the beginning of the work*, including but not limited to the Hopper Tank Basement, Receiving Hopper surrounding, Granulator surrounding, and cold runners." Appellant's App. Vol. II p. 126 (emphasis added). In context, "the work" could only mean reconstruction of the slag granulator. We conclude that the trial court did not err in finding that Holcim had breached the terms of the Agreement.

## II. Damages

Holcim challenges several of the trial court's findings regarding damages, which are as follows:

> The amounts that ACMS is entitled to recover for its additional time and materials it was required to furnish as a result to Holcim failing to clean the reconstruction site as required by [Paragraph 5] as follows:

| | |
|---|---|
| Additional stack weight, cleaning and delivery for Crane [Extra Work Item 2] | $559,328.21 |
| Cleaning Delays [Extra Work Item 4] | $146,981.85 |
| Stack Belly Band [Extra Work Item 7] | $75,355.58 |
| Scrap Transport [Extra Work Item 8] | $53,058.59 |
| East Basin Insert [Extra Work Item 9] | $36,673.40 |
| Additional overtime and labor [Extra Work Item 14] | $769,649.32 |
| Demolition of Receiving Hopper due to weight and anchoring issues [Extra Work Item 15] | $108,274.05 |

| | |
|---|---|
| Added scope to install expansion joint [Extra Work Item 16] | $44,153.69 |
| Scaffolding rework due to lack of cleaning [Extra Work Item 17] | $62,038.20 |
| Goggle Valve Standby Delays [Extra Work Item 19] | $178,665.02 |
| Extended overhead due to lack of cleaning [Extra Work Item 20] | $131,829.29 |
| Extended time Barnhart [Extra Work Item 22] | $75,205.37 |
| Claim preparation by ACMS staff [Extra Work Item 23] | $124,881.39 |
| Employment tax penalties and interest incurred due to Holcim not paying ACMS per Services Agreement | $763,953.00 |
| Union Benefit Contribution and penalties and interest due to Holcim not paying ACMS per Services Agreement | $170,009.09 |

|  |  |
|---|---|
| TOTAL DAMAGES CONTESTED BY HOLCIM | $3,300,056.05 |

PLUS STIPULATED DAMAGES

| | |
|---|---|
| Breach of Contract | $562,500.00 |
| Refractory Materials | $215,000.00 |
| Cladding for Cold Runner | $52,500.00 |
| ACMS Labor Support | $135,000.00 |
| Additional Water Line Demo | $5,724.42 |
| Additional Rigging Hopper | $47,500.00 |
| Pipe Elevation Check | $12,016.68 |
| Pipe for 30″ Fabrications | $8,868.74 |

| | |
|---|---|
| TOTAL DAMAGES | $4,339,165.89 |

Findings of Fact pp. 7–8.

## A. Damages Related to Extra Non-Labor Charges

### 1. Extra Work Items 8 and 22

[17] Holcim contends that the evidence does not support the trial court's award of $53,058.59 for scrap transport. Originally obligated to move six pieces of scrap from the jobsite to a "laydown area[,]" ACMS project manager Eric Bell testified that ACMS ended up transporting many more pieces of scrap over the course of a "couple of days[.]" Tr. Vol. III pp. 210, 211. The additional work caused ACMS to request an extra $53,058.00, which Bell testified was a "reasonable" amount. Tr. Vol. III p. 211. A project change request submitted by ACMS also reflects an additional charge of $58,058.19, sufficient to cover the award. The record supports the trial court's award for Extra Work Item 8.

[18] Holcim also contends that the $75,205.37 awarded for Extra Work Item 22 is a double award for Extra Work Item 8. The evidence indicates, however, that Extra Work Item 22 is for costs incurred in removing the old receiving hopper (and moving it off-site) and installing the new receiving hopper for the Holcim Project, which seems clearly distinct from the scrap removal related to the conveyor. The record supports the amount the trial court awarded for Extra Work Item 22.

### 2. Extra Work Item 15

[19] Holcim challenges the non-labor portion of the award for Extra Work Item 15 (for hopper demolition), which amounts to $39,735.38 of the $108,274.05 total. Holcim contends that there is no evidence to support the awarding of $13,560.27 for equipment, $15,937.73 for subcontractors, and $10,201.38 for

materials. As ACMS points out, however, the materials amount of $10,201.38 is supported by the invoices and other documents in ACMS Exhibits 83 and 84. Moreover, ACMS Exhibit 85 indicates that the equipment and subcontract charges total $29,534.00, which, when added to the materials costs, comes to $39,735.38. Finally, the total amount of Extra Work Item 15 (*i.e.*, $108,274.05) was listed in Joint Exhibit 31. Ex. Vol. IV p. 112. The trial court's award of $108,274.05 for Extra Work Item 15 is supported by the record.

### 3. *Extra Work Item 16*

[20] Holcim alleges that the non-labor costs included in Extra Work Item 16 (for the installation of an expansion joint) are not supported by the record, specifically subcontract costs of $18,383.00 and equipment costs of $3972.46. ACMS Exhibit 90, however, reflects a subcontract cost of $17,205.00, "used for manbasket on exp. joint install[.]" Ex. Vol. XIII pp. 50–51. When the applicable 7% sales tax that ACMS was required to pay is included, this figure comes to $18,409.35, sufficient to cover the subcontract component of the award for Extra Work Item 16. As for the equipment cost, ACMS Exhibit 91 is an invoice for the rental of a welder for $3972.46, supporting the amount of the equipment component of Extra Work Item 16. Ex. Vol. XIII p. 52. Finally, the total amount of Extra Work Item 16 (*i.e.*, $44,153.69) appears in Joint Exhibit 31 and described as being for "[e]xpansion joint replacement[.]" Ex. Vol. IV p. 113. The trial court properly awarded $44,153.69 for Extra Work Item 16.

### 4. *Extra Work Item 17*

Holcim contests the subcontract component of the $62,038.20 in damages awarded for Extra Work Item 17 (for scaffolding rework), alleging that insufficient trial testimony supports it. Bell, however, testified regarding the need for scaffolding, which was due to a lack of cleaning:

> Q    EX-17, the scaf – additional scaffolding, here again, what's the issue with that? Why did you have the additional – why did you have scaffolding additional cost?
> A    Well, down in the basement, especially, we were going to do it all by man lift, and when it never got cleaned, it had to be done with scaffolding.

Tr. Vol. V p. 27. As for the amount, the subcontract portion of Extra Work Item 17 is in the amount of $56,398.36, which is shown on ACMS Exhibit 1 in the "Subcontract $" column of Extra Work Item 17, designated "Scaffolding additional / Rework Due to lack of cleaning[.]" Ex. Vol. XI p. 133. The trial court's award of $62,038.20[2] for Extra Work Item 17 is supported by the record.

### 5.    *Extra Work Item 7*

Holcim contends that the award related to non-labor elements of Extra Work Item 7 ("Stack Belly Band due to misfabrication of spool piece"), which totaled of $55,484.48 and consisted of charges for subcontractors, materials, and equipment, is unsupported by the record. Appellant's App. Vol. II p. 135. Holcim incorrectly asserts that the only exhibit related to Extra Work Item 7 is ACMS Exhibit 53, which only documents the $6848.00 for materials. ACMS

---

[2] This amount represents the underlying charge plus a ten-percent markup, which Holcim does not contest.

Exhibit 55 documents the subcontractor portion of Extra Work Item 7, which was $47,362.00, paid to Solid Platforms, Inc. Moreover, ACMS Exhibit 52 documents the equipment portion of Extra Work Item 7, or $1274.48 paid to MPG Industrial. The trial court properly awarded damages for Extra Work Item 7.

### 6. *Extra Work Item 14*

[23]    Holcim challenges the non-labor portions of the award related to Extra Work Item 14. The trial court awarded ACMS $11,478.68 in non-labor damages related to Extra Work Item 14, "Additional Overtime and Additional Labor to accelerate schedule because of lack of cleaning," with $10,436.07 constituting the underlying amount and $1043.61 constituting a ten percent "mark-up" on that figure, for a total of $11,479.68. Appellant's App. Vol. II pp. 39, 135. The equipment portion of the charges included in Extra Work Item 14, which are in the amount of $10,436.07, plus ten percent mark-up are supported by the invoices included in ACMS Exhibits 79 and 80, which reflect equipment rental fees totaling $30,355.88 paid to LGH. This evidence covers the trial court's award of equipment costs related to Extra Work Item 14. The trial court's award of non-labor costs related to Extra Work Item 14 is supported by the evidence.

### 7. *Extra Work Item 19*

[24]    Holcim contends that ACMS did not present evidence sufficient to sustain the trial court's award of non-labor damages in the amount of $48,511.95 for Extra Work Item 19, "[No. 7] Goggle Valve – Standby Delays[.]" Appellant's App.

Vol. II p. 135.  The subcontractor damages related to Extra Work Item 19 are for additional, delay-related charges for equipment provided to ACMS by Central Rent-A-Crane and Barnhart.  The Central Rent-A-Crane portion of the charges is of $20,141.25 and is documented in ACMS Exhibit 95, identified in a hand-written note as "DELAY TIME CHANGE TOTAL[.]"  Ex. Vol. XIII p. 54.  The Barnhart portion of the non-labor charges, in the amount of $23,960.52, is also sufficiently supported by the record.  ACMS correctly contends that this sum is supported by contractual labor rates as detailed in the Barnhart subcontract, admitted as ACMS Exhibit 56.  Included in the subcontract is an invoice from Barnhart to ACMS for $68,368.52 for "[Holcim] labor[,]" which more than covers the award of $23,960.52 to ACMS.  Ex. Vol. XII p. 197.

## B.    Damages Related to Extra Labor Charges

### 1.    *Extra Work Item 23*

[25]    Holcim contends that the trial court's award of $124,881.39 in labor costs for "Overhead Claim Preparations" is unsupported by the record.  This contention is seemingly based on the assertion that this amount is only for labor costs that were incurred before November 15, 2021, the date on which Holcim received the request.  Holcim's argument on this point is essentially that the 1200 hours listed for this item could not possibly have been accrued prior to November 15, 2021.  As ACMS points out, however, Bell testified at trial that this total of 1200 hours did not reflect the time that had already been spent on claim preparation, it was, in fact, an estimate of the amount of time it would take

ACMS to prepare its claims, an estimate that, as it happened, turned out to be conservative:

> Q      Well, you agree that [Extra Work Item] 23 was provided in mid-November to Holcim, correct?
> A      I see that, yes.
> Q      And this number, $124,881.39 is on there, correct?
> A      I see that.
> Q      Okay.  So that's no longer an estimate, correct?  That's what's been provided to the client, to the buyer?
> A      Correct.
> Q      Correct?  And you understand that this was included in that white binder as backup for that amount, correct?
> A      I do.
> Q      So at that point, ACMS'[s] position is this is what we spent, correct?
> A      *This was an estimate that was done in November of '21.  The amount of time that's been spent in the last three years on this.  This is quite a bit low estimate.*
> Q      *On the audit?*
> A      *No, on preparation for the claim.*

Tr. Vol. IV pp. 118–19 (emphasis added).  The trial court's award of $124,881.39 in labor costs for claim preparation is supported by the record.

### 2.      *Extra Work Item 20*

[26]      Holcim contends that the record does not support the trial court's award of $88,104.86 to ACMS for "extended overhead" of 876 hours due to cleaning delays.  Holcim specifically alleges, as an example, that Walleske was going to be credited with working ten shifts of twelve hours when the evidence indicated that he had only worked six such shifts.  A record included in Joint Exhibit 21 (identified as pertaining to "Extended Overhead caused by lack of Cleaning")

indicates, however, that Walleske had, in fact, worked ten additional shifts of twelve or more hours related to cleaning delays. Ex. Vol. III p. 246. The trial court's award for Extra Work Item 20 is supported by the record.[3]

### 3. *Extra Work Item 4*

[27] Holcim contends that the trial court abused its discretion in awarding $146,981.85 in labor costs for 1462 hours of standby for "Cleaning Delays[,]" Appellant's App. Vol. II p. 135, on the basis that ACMS employees had performed some amount of legitimate work during the cleaning-related delay and that those hours were not distinguished from the standby hours. We conclude that this argument is without merit. Walleske testified that, as of September 1, 2021, no work could be done in any areas because no cleaning had been done and that, from September 1 to 7, 2021, he had had "general foremen[,] superintendents, foremen[,] and craftsmen" on "standby […] waiting to go to work." Tr. Vol. III p. 24.

[28] Moreover, Bell testified regarding Extra Work Item 4 as follows:

> Q      So essentially, [Extra Work Item 4] then is for that first week where the employees of ACMS were essentially on standby, correct?
> A      Yes.
> Q      And you heard Shane Walleske's testimony already on the fact that nothing – none of the actual work could be done?
> A      Correct.
> Q      Do you disagree with that testimony?

---

[3] Holcim does not identify any other employee whose associated award for extended overhead is unsupported by the record.

A     No.

Q     Okay. And you also heard the testimony about the time cards listing that there was training going on; do you recall that testimony?

A     I do.

Q     Okay. And is it common when employees of ACMS are on standby and they are there on the job and can't being doing the add – the actual work, that they would be given some type of training to basically – so they're occupied productively in some manner?

A     Yeah, they're gonna review the scope; they'll do a continuing add; they'll do safety. They're not just sitting there playing on their phones.

Q     But I take it when you prepared your bid for this project, you did not include that there was gonna be one week at the very beginning of standby where the guys were gonna be on the job but couldn't do any work?

A     No.

Q     And the term "standby," you heard the definition that was previously given in court?

A     Yes, sir.

Q     And do you agree with that definition?

A     Yes.

Q     And is it the industry standard that standby, when it's not caused by the contractor, caused by the owner, would be paid by the owner to the contract?

A     Industry standard, yes.

Tr. Vol. III pp. 178–79. To the extent that ACMS employees were working or receiving training during the week they were on standby, a reasonable inference based on the above is that they were nonetheless not directly engaged in the "actual work" of rebuilding the slag granulator, a situation directly caused by Holcim's failure to clean. Holcim has failed to establish clear error in the award for Extra Work Item 4.

### 4.    *Extra Work Item 2*

[29]    Holcim contends that the trial court erred in awarding ACMS $559,328.21 ($508,480.19 for subcontract costs plus a ten-percent markup of $50,848.02) for Extra Work Item 2, "Crane:  Additional Stack weight/[Holcim] Deliveries/Cleaning efforts[.]"  Appellant's App. Vol. XIII p. 133.  Regarding Holcim's use of the 600-ton crane ACMS rented from Stevenson Crane, the parties stipulated the following in a pre-trial order:

> 5.19    Stevenson Crane delivered and assembled a 600-Ton Crane to the jobsite of the Slag Granulator Reconstruction Project on or about September 17, 2021.  The Stevenson Crane was used on the Slag Granulator Reconstruction Project during a period from September 19, 2021 through October 15, 2021, and the Stevenson Crane rental charges for its 600-Ton crane during this period in the amount of $615,821.59 are reasonable charges for this leased equipment that ACMS provided and paid as rent for the crane's use on the Project.
> 5.20    Holcim at times used the Stevenson 600-Ton crane for performing cleaning operations on the Slag Granulator Reconstruction Project, and Holcim did not maintain a log of Holcim's cleaning operations or the use of the Stevenson 600-Ton crane for Holcim's cleaning operations.
> 5.21    Under the Services Agreement Holcim was responsible for performing all cleaning operations required to allow ACMS to proceed with the work contracted to ACMS under the Services Agreement.

Appellant's App. Vol. VI p. 46.  Moreover, Bell testified that the 600-ton crane was kept on the job at the request of Holcim for use in cleaning and that it was "100 percent used for cleaning" after September 19 and 20, 2021.  Tr. Vol. III p. 177.  Krystal Ulm, Holcim's cleaning crew shift supervisor, also confirmed that the 600-ton crane was used extensively by Holcim to clean.  This supports an

award to reimburse ACMS for a portion of the rental costs for the 600-ton crane.

[30] As ACMS correctly observes, then, the only question is one of allocation of the $615,821.59 rental cost. Bell testified that ACMS gave Holcim a "more than a fair credit" of $63,835.80 for ACMS's use of the 600-ton Crane on September 19 and 20, 2021, to remove what it referred to as the lower stack (*i.e.*, for work not related to cleaning). Tr. Vol. III p. 176. Applying the credit to the extent supported by the record would have left Holcim liable for $551,985.79, which is more than the $508,480.19 base amount the trial court actually awarded. There is sufficient evidence to support the trial court's award of $559,328.21 for costs related to the 600-ton crane.

## C. Consequential Damages Related to Employment Taxes and Union-Benefit Contributions

[31] Holcim challenges the award of $763,953.00 for employment tax penalties and $170,009.09 in union benefit penalties and interest incurred because of non-payment by Holcim, arguing that they were not reasonably foreseeable as a matter of law. Generally, "a party injured by a breach of contract may receive consequential damages." *Indpls. City Market Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1024 (Ind. Ct. App. 2009).

> [T]he measure of damages in a breach of contract action is limited by what is reasonably foreseeable at the time the parties entered into the contract, not what is known at the time of the breach; the test is an objective one. *Berkel & Co. Contractors, Inc. v. Palm & Assoc., Inc.*, 814 N.E.2d 649, 658–59 (Ind. Ct. App. 2004).

"Foreseeability means that which it is objectively reasonable to expect, not merely what might conceivably occur." *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 249 (Ind. Ct. App. 2010) (citation omitted). "Conversely, damages which do not arise naturally from the breach of contract, or which are not within the contemplation of the parties at the time the contract is entered into, are not recoverable." *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000), *trans. denied*; *see Belle City Amusements, Inc.*, 936 N.E.2d at 249–50 (holding that lost profits beyond 2009 for vendor's breach of contract to supply a festival midway in 2008 and 2009 were not reasonably foreseeable as a consequence of the breach); [*Hopper v. Colonial Motel Props., Inc.*, 762 N.E.2d 181, 187–88 (Ind. Ct. App. 2002)] (damages for personal injury caused to motel patron when the person in the room above accidentally discharged a gun into her room were not reasonably foreseeable at the time the injured party and the motel entered into a contract for rental of the room). "[T]he possibility that a particular injury is not a foreseeable result of a particular breach of contract should not completely foreclose a litigant from proving the breach and recovering those damages which he can show to be a foreseeable consequence of the breach." *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1249 (Ind. Ct. App. 1998), *trans. denied*. […] The issue of foreseeability of damages is generally to be determined by the trier of fact. *Bob Anderson Pontiac, Inc. v. Davidson*, 155 Ind. App. 395, 403, 293 N.E.2d 232, 236 (1973).

*WESCO Distrib., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 709–10 (Ind. Ct. App. 2014).

[32] Keeping in mind that the question of reasonable foreseeability of damages is one for the trier of fact (in this case, the trial court), we conclude that ACMS has established that the award of consequential damages was appropriate. ACMS contends that there is "extensive evidence in the testimony of the

witnesses that Holcim knew at the time that the [Agreement] was entered into that ACMS needed timely payment in order to meet its financial obligations." Appellee's Br. p. 39. ACMS also argues that

> [a]s an employer of operating engineers who comprised Holcim's production workforce and who performed some of Holcim's cleaning work, and as an owner that regularly hires local union construction contractors, Holcim knew that the ERISA benefits funds for such union construction employees required monthly payments and imposed significant liquidated damage penalties and interest for late payments. As an employer, Holcim also knew about employment taxes and the penalties and interest that are imposed upon employers for such late payments.

Appellee's Br. p. 39.

[33] We agree with ACMS that, given the context and parties involved, the trial court was entitled to infer that a reasonable person in Holcim's position would expect that withholding of payment would cause consequential damage to ACMS. In the context of the steel industry, it was reasonable to infer that Holcim was familiar with the standard obligations of unionized contractors such as ACMS, including monthly benefit payments and employment tax deadlines, as well as the consequences for failing to fulfil those obligations. Regardless of what Holcim may or may not have subjectively believed about ACMS's financial health, it was objectively foreseeable when entering into the Agreement that withholding payment (especially of the contract amount) would result in consequential damages to ACMS.

[34] Indeed, Holcim's argument seems to acknowledge that it was reasonably foreseeable that its nonpayment would cause ACMS financial difficulties.

Holcim's main arguments seem to be that (1) nobody at ACMS informed Holcim that nonpayment would cause financial difficulty and (2) ACMS's marketing materials, which—unsurprisingly—tended to project an image of financial health and stature in the market, undercut what might otherwise have been such a reasonable expectation. Holcim, however, points to no evidence that any of ACMS's marketing material had ever been seen by anyone at Holcim, much less that it had factored into their decision to withhold payment. To the extent that the trial court declined to find that ACMS's marketing materials had had this effect, it was entitled to do so.

[35]     Other evidence undercuts Holcim's argument. DePaoli testified that "we probably informed [Holcim] that it would be a tough one for us to take on that amount of money when, you know, the whole idea in the construction industry is to—is your cash flow." Tr. Vol. V p. 132. When asked if it was ACMS's position that Holcim should have foreseen that non-payment would cause it to incur union-benefit penalties, DePaoli responded, "I would think they would have at least figured that out. It ain't hard." Tr. Vol. V p. 133.

[36]     Finally, Holcim's actions during settlement negotiations strongly support an inference that it suspected that it had ACMS over a barrel: DePaoli testified that Holcim's initial settlement offer was $250,000.00, which "wasn't even the contract amount" and an offer he agreed, when asked, was "a slap in the face[.]" Tr. Vol. V pp. 133, 152. Taken as a whole, the record supports an inference that the damages caused to ACMS by Holcim's nonpayment of contract and other extra costs were reasonably foreseeable.

The judgment of the trial court is affirmed.

May, J., and Mathias, J., concur.

ATTORNEY FOR APPELLANT

Jeff Carroll
Koransky Bouwer & Poracky, P.C.
Dyer, Indiana

ATTORNEYS FOR APPELLEE

Stephen M. Maish
Patrick A. Mysliwy
Maish & Mysliwy
Hammond, Indiana